ERNEST AMOS, COMPTROLLER, *Appellant,* v. SHELTON J. GUNN, INDIVIDUALLY AND AS CITIZEN AND TAXPAYER AND AS MEMBER OF THE LEGISLATURE SUING ON BEHALF OF HIMSELF AND OTHERS SIMILARLY SITUATED, *Appellee.*

First Opinion Filed April 7, 1922.

Petition for rehearing granted May 29, 1922.

Opinion reversing order filed August 18, 1922.

Petition for rehearing denied October 11, 1922.

An Appeal from the Circuit Court for Leon County, E. C. Love, Judge.

1. The provision in Section 17 of Article III of the Constitution that all bills and joint resolutions passed by the Legislature

be signed by the presiding officers of the "respective Houses, and by the Secretary of the Senate and the Clerk of the House of Representatives" is mandatory and requires such procedure to be observed while the Legislature is in session.

2. The provision in Section 28 of Article III of the Constitution that every "bill that may have passed the legislature shall, before becoming a law, be presented to the Governor," etc., is mandatory and requires the presentation of every bill passed to be made to the Governor while the legislature is in session. WHITFIELD and WEST, JJ., dissent from the last six words.

3. The provision in Section 28 of Article III of the Constitution relating to the veto power of the Governor, invests the Chief Executive of the State with a power in trust to be exercised to the end that its full purpose of providing a check upon errors and protecting the constitutional rights of the people against abridgments be realized, and it cannot be ignored nor lessened by the legislature, nor its presiding officers.

4. A demurrer to a pleading admits the truth of all essential matters of fact as are well and sufficiently pleaded, but it does not admit as true allegations or averments of fact which the law would not allow to be proved or that are inconsistent with law.

5. An allegation in a bill of complaint attacking the validity of an Act of the Legislature that a certain document on file in the office of the Secretary of State purporting to be an official Act of the Legislature and purporting to be duly enrolled and signed by the presiding officers of the two Houses of the Legislature and their respective clerks and duly approved by the Governor, is not in fact an Act of the Legislature because it was never presented by that body to the Governor, nor signed by the presiding officers and clerks of the two Houses of the Legislature while that body was in session, is not susceptible of proof by parol evidence or other means aliunde the legislative journals or other public records in the office

of the Governor or Secretary of State.  And such allegation, standing alone, which does not also affirm the existence of a public record in the office of the Governor or Secretary of State which shows the alleged defects to exist is not admitted by demurrer to the bill of complaint.  BROWNE, C. J., and TAYLOR, J., dissent.

6.  A document on file in the office of the Secretary of State, purporting to be an enrolled bill duly passed by the Legislature and duly signed by the presiding officers and clerks of the two Houses of the Legislature is *prima facie* a valid Act of the Legislature and may not be impeached by any evidence of less dignity than a public record of an official executive or legislative Act.  BROWNE, C. J., and TAYLOR, J., dissent.

7.  The word "bill" as used in Section 28 of Article III of the Constitution providing that every "bill" that may have passed the Legislature shall, before becoming a law, be presented to the Governor; and as used in the proviso to Section 17 of Article III of the Constitution providing that all "bills" so passed shall be signed by the presiding officers of the respective Houses, etc., refers not to the original document containing the proposition as first submitted but to the last writing containing all the amendments, if any are made, by the Legislature in the "bill's" passage.  It is the original proposition in its altered or amended form.

8.  A public record is a written memorial made by a public officer authorized by law to make it.  It is required by law to be kept, or necessary to be kept, in the discharge of a duty imposed, by law, or directed by law to serve as a memorial and evidence of something written, said or done.

9.  A document on file in the office of the Secretary of State purporting to be an enrolled bill duly passed by the Legislature and duly signed by the presiding officers and clerks of both Houses and duly approved by the Governor is a public record of an official act of the legislative and executive departments.  BROWNE, C. J., and TAYLOR, J., dissent.

10. The approval by the Governor of a bill purporting to have been duly passed by the Legislature and presented to him in conformity with the requirements of Section 28 of Article III of the Constitution, is equivalent to a certificate by the Governor that it came to his possession in due course. Such a document is a public record of a co-ordinate branch of the State government and the judicial branch of the government has no power to adjudge it to have been made in a manner not in conformity with the rules and regulations of law, in the absence of a specific and unequivocal charge of fraud on the part of the officials concerned, or the existence of some public record of equal dignity to show the abuse of authority or violation of law by them. BROWNE, C. J., and TAYLOR, J., dissent.

11. The court has no power to take judicial knowledge of facts existing in pais depending upon parol testimonoy to establish them, that will destroy the faith and credit which the law requires to be given to a public record, and leave the officer, whose duty, or power, in law it was to make the record, under suspicion of fraudulent conduct in the making of it. BROWNE, C. J., and TAYLOR, J., dissent.

12. Judicial knowledge is confined to the record when an official act of the legislative or executive department is called in question and such record is authentic and complete in itself. BROWNE, C. J., and TAYLOR, J., dissent.

13. The invalidity of a statute cannot be proved by the admissions of parties in a cause in which rights are involved under such statute. BROWNE, C. J., and TAYLOR, J., dissent.

14. Section 5 of Articlce XIV of the Constitution providing that the "Legislature may provide for————a tax on licenses" is not a limitation upon the inherent power of the Legislature to impose excise, occupational or other taxes that are in the nature of license or privilege taxes. It is an express declaration of a power that exists in the Legislature.

15. The provisions of Chapter 8411 Acts of 1921 imposing a tax of five dollars for each place of business and one cent per

gallon on gasoline sold, is not objectionable as double taxation. Both exactions amount to but one license tax.

16. An "excise tax" is one laid on licenses to pursue certain occupations, corporate privileges or sales or consumption of commodities.

17. An excise tax partakes of the nature of a license tax.

18. A tax of one cent a gallon on sales of products within the State after they have lost their interstate character is an excise tax which is in effect a license tax; and the lawmaking power of the State may impose excise or license taxes within its discretion unless restrained by organic or paramount provisions of law.

19. The State and Federal Constitutions and Federal laws and treaties contain no limitation upon the power of the State Legislature to impose license taxes within its jurisdiction, except that due process, equal protection and contract rights shall be observed, and interstate commerce shall not be burdened or the exercise of Federal power interfered with.

20. The title and body of Chapter 8411 Acts of 1921, relate to the payment of license taxes and the taxes imposed are all occupational and excise taxes which in their essential nature are license taxes. Such taxes so imposed accord with due process of law, do not deny equal protection of the laws or impair the obligation of contracts or interfere with interstate commerce, or with the exercise of any Federal power.

21. The tax of one cent a gallon on sales of gasoline imposed by Chapter 8411 upon dealers in such commodity is by the terms of the statute merely a tax on the first intrastate sale after the product "has lost its interstate character." It applies to all alike under similar conditions, does not interfere with any contract right, and can in no way burden interstate commerce or interfere with Federal authority. The fact that none of the products is produced in the State does not make the intrastate license or excise tax discriminate against the producing States.

10—Vol. 84.

22. Chapter 8411 is not arbitrary or oppressive or unjustly discriminating in its provisions; the penalties provided for are manifestly not excessive and the Act is not void for uncertainty.

23. The discretionary power of the lawmaking department to impose fines to redress wrongs done, is limited only by the organic provisions requiring due process and equal protection of the laws to be observed and forbidding excessive fines to be imposed.

24. Fines may be excessive within the prohibitions of the Constitution when they are so great or numerous as to shock the conscience of reasonable men, or are patently and unreasonably harsh or oppressive as penalties for the wrongs sought to be redressed, or so great or numerous as to intimidate persons in asserting their rights to test the validity of laws or regulations which they may be required to observe, and thereby to deny due process and equal protection of the laws.

25. There being no definitely fixed rules or standards for determining what are and what are not excessive fines, each case whether a statute prescribing fines or a judgment imposing a fine under a statute, must be adjudged on its merits, and the courts will not declare a statutory fine to be excessive in violation of the Constitution unless it is plainly and undoubtedly in excess of any reasonable requirements for redressing the wrong.

BROWNE C. J., AND TAYLOR, J., concur in these headnotes except as to Nos. 5, 6, 9, 10, 11, 12 and 13.

Order reversed.

Rivers Buford, Attorney General, and J. B. Gaines, Assistant, for Appellant;

C. M. Cooper, Chas. P. & J. J. G. Cooper, for Appellee.

BROWNE, C. J.—It appears from the record, and it is not

controverted, that House Bill No. 702, published as Chapter 8411 of the Laws of Florida, Acts of 1921, was not signed by the presiding officers of the Senate and House of Representatives until after the expiration of the constitutional period of sixty days during which ·a legislative session may last, and after the legislature adjourned *sine die* on the 3rd day of June, 1921.

This presents the question of the validity of the act, in which is involved whether or not in its passage through the two houses of the legislature, from the time of its introduction in the House to its signature by the presiding officers, all the constitutional requirements for making a bill a law, were complied with.

To decide this, we must consider and determine these two questions:

(1)   Are the signatures of the presiding officers of the two houses of the legislature essential before ·a bill can become a law?

(2)   If such signatures are essential, must the bill be signed before the legislature adjourns *sine die?*

To both of these queries, we are compelled to answer, yes.

The clause of the constitution on this subject is: ·"all bills or joint resolutions so passed shall be signed by the presiding officer of the respective houses." Art. III, Sec. 17, Constitution of Florida.

This is as mandatory as any other constitutional provision controlling the valid enactment of a law, and we have no hesitancy in declaring that the signing of a bill by "the presiding officer of the respective houses," is essential to the valid enactment of a bill into a law.

From saying that this provision of the constitution is mandatory, it must not be inferred that we regard any of the provisions of that great charter of liberties as merely directory, as we fully agree with what was said in the case of Hunt v. State, 22 Tex. App. 396, 3 S. W. Rep. 233. ''But notwithstanding these decisions are by able courts, the great weight of authority seems to be the other way, holding that the courts nor any other department of the government are at liberty to regard any provision of the Constitution as merely directory, but that each and every of its provisions must be treated as imperative and mandatory, without reference to the rules distinguishing between directory and mandatory statutes. Judge Cooley, in his great work on Constitutional Limitation, upon this subject says: 'The courts tread upon very dangerous ground when they venture to apply the rules which distinguish directory and mandatory statutes to the provisions of a constitu·tion.' ''

Judge Cooley also has this to say on the mandatory character of constitutional provisions: ''If, therefore, a constitutional provision is to be enforced at all, it must be treated as mandatory. And if the legislature habitually disregard it, it seems to us that there is all the more urgent necessity that the courts should enforce it.

And it also seems to us that there are few evils which can be inflicted by a strict adherence to the law, so great is that which is done by the habitual disregard, by any department of the government, of a plain requirement of that instrument from which it derives its authority, and which ought, therefore, to be scrupulously observed and obeyed.'' Cooley's Const. Lim. (6 Ed.). 180.

We come now to the second question: when shall the presiding officers perform this duty?

The signing of a bill by the presiding officer of either house is a legislative act, and after the expiration of the period of sixty days to which it is limited by the constitution and after the adjournment of the legislature *sine die,* neither the legislature, nor any member thereof, including the presiding officers, can perform any act required by the constitution to be done in the passage of a bill.

If the duty of the presiding officer to sign bills properly passed by the body over which he presides, is not a legislative act, but merely a ministerial one it follows, (1) that a writ of mandamus would lie to require him to sign a bill, and (2) that an injunction would lie to restrain him from signing a bill upon an application showing that he was about to sign an unconstitutional measure.

Such a construction would make the proceedings of the legislature subordinate to the judicial power. This proposition needs only to be stated to be its own refutation.

If the presiding officer of either house of the legislature may lawfully withhold his signature from a bill that had been regularly and properly passed by the house over which he presides, until after the *sine die* adjournment of the legislature, it would be within his power to defeat the passage of any bill by holding it until after the adjournment and then refusing or failing to sign it.

On the other hand, if this duty is one that must be performed during the session, and the presiding officer should refuse to sign it, he could be required to do so, or deposed from office and another "presiding officer" elected, who would have authority and whose duty it would be to sign the bill.

One construction deprives the legislature of the power to control its presiding officers and lodges in either of them

the power to defeat a bill otherwise regularly, lawfully and constitutionally passed.

The other permits the legislature to control its presiding officers and to require them to perform their duties.

The necessity for the presiding officers to sign an act before the constitutional term of the legislature has expired, seems to have been recognized by the presiding officers of the Senate and House of Representatives in signing House Bill No. 702, because, while it is admitted that each of these officers signed the bill at least twenty-four hours after the legislature adjourned *sine die,* the Speaker certified that it had "passed the House of Representatives this 28th day of May A. D., 1921," and the President of the Senate certified that it "passed the Senate this 2nd day of June A. D., 1921."

The use of the terms: "this 28th day of May," and "this 2nd day of June," means that these were the days and dates when the presiding officers affixed their signatures thereto.

If the President of the Senate and the Speaker of the House had construed the constitutional requirement to mean that they could sign the bill any time after the adjournment of the legislature *sine die,* the certificate of the Speaker of the House would have been and to this effect, "passed the House of Representatives *the* 28th day of May, A. D. 1921, "and "signed by me *this* 4th day of June A. D. 1921." And so of the signature of the president of the Senate.

The cases cited on both sides of the question under consideration, are not determinative, and no useful purpose would be served in discussing them. In some, the provi-

sions of the constitution differ from ours, in others a different situation was presented, and in two instances where the courts at one time held one way, later decisions seem to adopt or at least to favor a different rule.

We are firmly of the opinion that the presiding officer of either house of the legislature has no authority to sign a bill after the adjournment of the legislature *sine die*.

It is unfortunate that this situation has arisen, but this court has nothing to do with the manner in which the legislature performs its duties, and if it adjourns without having completed them, among which is to see that its presiding officers have signed all bills that have duly and properly passed both houses, it has allowed the bill to die, and this court cannot breathe into it the breath of life.

We are keenly alive to the seriousness involved in courts nullifying what purports to be a law enacted by the legislature, but we are as keenly alive to the seriousness involved in giving life by judicial sanction to such enactments when in their passage through the legislature all the constitutional requirements have not been observed. The rights of persons and property and human liberties, are not apt to be affected by legislative non-action, or by the failure of proposed legislation, but they may be seriously impaired if the courts sanction lax methods in attempting to enact laws, and treat as unessential, constitutional provisions governing the legislature and its officers in the enactment of laws.

The view which we take of this case precludes the determination of other questions involved.

As the requirements of Article III, Sec. 17 of the Constitution of Florida were not complied with, the act never

became a law, and the judgment of the chancellor is affirmed.

TAYLOR AND ELLIS. J. J., concur.

WHITFIELD AND WEST, J. J., dissent.

WHITFIELD, J., dissenting.—The real question presented is whether an act that appears by the journals of each house to have been duly passed by the legislature and that appears by the enrolled bill to have been duly approved and signed by the Governor, is invalid because the bill that was duly passed, was enrolled, and was signed by the legislative officers and received by the Governor the day after the legislature adjourned *sine die*, the Governor having ten days after the adjournment within which to approve or to veto the bill. The complainant below had the burden of showing the invalidity of the Act.

If the mere failure of the legislative officers to sign a bill before final adjournment of the legislature, destroys an act that was duly passed by the legislature and duly approved by the Governor, then the powers of the legislative and executive departments of the State government may be rendered important by a mere ministerial inadvertance. Certainly the provisions of the constitution that *all* bills  *  shall be signed by the presiding officer of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives,'' does not contemplate such a result. It merely imposes a duty to sign *all* duly passed bills. By express provision of the constitution ''every bill that may have passed the legislature'' and that may be duly approved by the Governor, ''shall be a law.'' This clearly shows the required signing of bills by the legislative officers is for purposes of identification

and authentication. State v. Glenn, 18 Nev. 34, 1 Pac. Rep. 186; Evans v. Browne, 30 Ind. 514; 95 Am. Dec. 710.

The duty of the legislative officers to sign *all* bills that have been duly passed by both houses of the legislature is absolute; but the constitution does not provide that the bill shall not become a law until it is so signed as in State *ex rel.* Attorney General v. Mead, 71 Mo. 266, and Hamlett v. McCreary, 153 Ky. 755, 156 S. W. Rep. 410; Douglas v. Bank, 1 Mo. 20, 410, and such signing is not a part of the passage of a bill, and the Governor alone is empowered to approve or disapprove such bills, therefore the required signing can be only for purposes of authentication. And since the constitution does not require such signing to be done in open session, as in State *ex rel.* McClay v. Mickey, 73 Neb. 281, 102 N. W. Rep. 679, or that the signing shall be noted in the journals as in Hunt v. State, 22 Tex. App. 396, 3 S. W. Rep. 233, it may properly be done the day after the adjournment of the legislature if it were inadvertantly omitted to be done before adjournment, no wrong doing being involved. See Houston & Texas Central R. R. Co. v. Odum, 53 Tex. 343. The authentication by signing the bill in this case satisfied the Governor who approved the bill that had "passed the legislature." See Cottrell v. State, 9 Neb. 125, text 129, 1 N. W. Rep. 1008; State v. Glenn, *supra;* Lankford v. Somerset Co., 73 Md. 105, 20 Atl. Rep. 1017, 11 L. R. A. 491; Dow v. Beidelman, 40 Ark. 325, 5 S. W. Rep. 297; State *ex rel.* Railroad Commission v. Missouri Pac. R. Co., 100 Neb. 700, 161 N. W. Rep. 270; Taylor v. Wilson, 17 Neb. 88, 22 N. W. Rep. 119. In People v. Rose, 167 Ill. 147, the bill was enrolled and signed by the legislative officers some days after the legislature adjourned. The Constitutional provisions are similar to ours.

The legislative rules of procedure contemplate such sign-

ing before the legislative session ends, but do not forbid the signing to be done after adjournment; and such rules cannot operate to prevent the performance of duties expressly commanded by the constitution or to destroy organic functions. Simon v. State, 86 Ark. 527, 111 S. W. Rep. 991. No provision of the constitution was violated by the legislature or the Governor in enacting and approving Chapter 8411, and no authority is shown for nullifying the law.

Courts have no power to annul a law that has been duly passed by the legislature and duly signed by the Governor when no provision of the constitution was violated in enacting the law, and its contents accord with organic law. . Detailed considerations confirm these conclusions.

Where the validity of the enactment of a statute is challenged, and the journals of the two houses affirmatively show that the bill was duly passed by the legislature, and the enrolled bill on file in the office of the Secretary of State shows that it is duly authenticated by the signatures of all the legislative officers who are by the constitution and by the legislative rules required to sign the enrolled bill and it also appears by such enrolled bill that it was approved and signed by the Governor and filed in the office of the Secretary of State within the time fixed by the constitution for executive action on such bills, *if a demurrer may admit allegations* that the bill was in fact enrolled, signed by the legislative officers and received by the Governor after the adjournment of the legislature for the session, the demurrer does not admit allegations that such enrollment and signing by the legislative officials and receipt of the bill by the Governor after the adjournment of the legislature, were unauthorized and render the approval of the bill by the Governor ineffectual to make it a law, since the

stated conclusions are untenable in view of the provisions of the State constitution regulating the enactment and approval of statutes.

The essentials in the enactment of a law are (1) A bill containing the prescribed enacting clause and appropriate title and provisions; this is shown by the bill itself. (2) The passage of the bill by a *viva voce vote of a* majority of the members present in each House a majority of the members of each House being present, the yea and nay vote on final passage to be entered on the journal of each House. Bills making appropriations for claims the subject-matter of which shall not have been provided for by pre-existing laws must be passed by two-thirds of the members elected to each house of the legislature. This must appear by the journals. (3) The approval by the Governor of the bill that passed the legislature, or the failure of the Governor to act on the bill within the time prescribed by the constitution, or the passage of the bill over the Governor's veto by a two-thirds vote of each house, the vote to be entered on the journal of each House. Approval by the Governor appears by the bill itself.

The constitution provides that every bill shall in each House be read on three several days, and be read by its title on its first reading and by its sections on its second reading unless two-thirds of the members present otherwise order, and that every bill (except a general revision of the laws), shall be read by its sections on its final passage, and that all bills that are duly passed "shall be signed by the presiding officer of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives," and that before becoming a law every bill passed by the legislature shall be presented to the Governor. These proceedings are not by the constitution required to

be noted on the journal. State *ex rel.* Turner v. Hocker, 36 Fla. 358, 18 South. Rep. 767 ; West v. State, 50 Fla. 154, 39 South. Rep. 412 ; Wade v. Atlantic Lumber Co., 51 Fla. 638, 41 South. Rep. 72 ; Rushton v. State, 58 Fla. 94, 50 South. Rep. 486.

In the absence of fraud and of controlling provisions of law, the due passage of a bill by the legislature is conclusively shown by the journals of the two houses of which the courts take judicial notice ; and the signing of the bill by the legislative officers and the approval and signing of the bill by the Governor, are conclusively shown by the enrolled bills on file in the office of the Secretary of State of which journals and enrolled bill the courts take judicial notice. See State *ex rel.* Markens v. Brown, 20 Fla. 407 ; State *ex rel.* Attorney General v. Green, 36 Fla. 154, 18 South. Rep. 334 ; Amos v. Masley, 74 Fla. 555, 77 South. Rep. 619 ; State *ex rel.* Turner v. Hocker, 36 Fla. 358, 18 South Rep. 767 ; Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 688.

It clearly appears by the legislative journals, of which the court takes judicial notice, that House Bill No. 702, published as Chapter 8411, Laws of Florida, was duly passed by the House, that the yea and nay vote on final passage was duly entered on the House Journal, that the passage of the Bill by the House was duly communicated to the Senate with a transmission of the bill, that the Senate duly passed the bill with amendments, that the yea and nay vote on final passage of the bill in the Senate was duly entered on the Journal of the Senate, that the bill with the amendments were duly transmitted to the House, that the House concurred in the Senate amendments and the Senate was notified thereof. There was no reconsideration of the vote by which House Bill No. 702 as amended was finally and duly passed by a recorded yea and nay vote in each house.

This establishes the due passage of the bill by both houses of the legislature, and it is not questioned by the complainant. The Governor signed the bill within the time fixed by the constitution for executive action, and it therefore became a law when signed by the Governor. Sec. 28, Art. III, Const. There is no suggestion that Chapter 8411 is not in fact the same as House Bill No. 702 as finally passed by both houses and as signed by the legislative officers, and approved and signed by the Governor. Their identity appears to be conceded in the bill of complaint.

The enrolled bill on file in the office of the Secretary of State of which the court takes judicial notice, contains the following endorsements.

"House Bill No. 702.

Passed by the House of Representatives this 28th day of May, A. D. 1921.

Frank E. Jennings,

Speaker of the House of Representatives.

B. A. Meginniss,

Chief Clerk of the House of Representatives.

Passed the Senate this 2nd day of June, A. D. 1921.

W. A. McWilliams,

President of the Senate.

C. A. Finley,
Secretary of the Senate.

Examined and found correctly enrolled.

L. C. Crofton,

Chairman of Committee on Enrolled Bills.

I certify that this Act originated in the House of Rep-
resentatives.

B. A. Meginniss,

Chief Clerk of the House of Representatives.

J. B. Shuman,

Enrolling Clerk of the House of Representatives.

Approved this 10th day of June, A. D. 1921.

Cary A. Hardee,

Governor.''

The legislature adjourned *sine die* June 3rd, 1921.    See
Acts of 1921, page 462; page 2792 Senate Journal of 1921;
Page 3581 Journal of the House of Representatives of 1921.

The legislative rules of procedure provide that after a bill
shall have passed both houses it shall be enrolled as requir-
ed by the statute (Sec. 82 Rev. Gen. Stats.), and that after
the enrolled bill has been examined and compared with the
engrossed bill by the joint legislative committee it shall be

signed in the respective houses by the legislative officers, designated, and then the enrolled bill shall be endorsed by the secretary or clerk certifying in which house the bill originated, and then the bill shall by the legislative committee be presented to the Governor and a report of the day of such presentation entered on the journals.    It is in effect argued that these rules interpret the constitutional provisions relating to the signing of bills and to the presentation of the same to the Governor, and that non-compliance with the rule renders a bill inoperative as law, even though the bill, as duly passed, was, after the adjournment of the legislature, in fact enrolled, authenticated and signed by the legislative officers who are by the constitution and by the legislative rules required to sign it, and the bill is approved and signed by the Governor and filed in the office of the Secretary of State within the time fixed by the constitution for executive action on the bill.    The provisions of the constitution do not sustain this contention.

Where an act was duly passed by the legislative department and duly approved by the Executive department, the mere fact that the bill as passed, was,*on the day* after the legislature adjourned, enrolled and signed by the legislative officers who are by the constitution and by the legislative rules required to sign *all duly* passed bills, does not authorized the judicial department to nullify the Act, when the enrolling and signing of the bill after the adjournment of the legislature is not forbidden by any law or rule, and no misconduct is involved.

Section 6, Art. III of the Constitution provides that "each house shall * * * determine the rules of its proceedings."    This authorized the adoption of rules of procedure to be observed in exercising legislative functions; but such rules cannot avail to prevent the constitutional legislative

officers from performing an organic command to sign *all* bills that have been duly passed by both houses of the legislature the time, place and manner of such signing not being fixed by the constitution. The *constitution* does not require bills to be signed by the legislative officers or to be presented to the Governor *during the session* or that such signing and presentation shall be noted in the journals; and the legislative rules do not expressly forbid the enrollment, authentication, signing and presentation to the Governor after adjournment of bills that were duly passed by both houses. Nor can legislative rules preclude action on duly passed bills by the Governor, however such bills may be presented to him, when the constitution does not prescribe the time, means or manner of presentation to the Governor, but does require a presentation to and action on such bills by the Governor.

The constitution provides: ''The Senate shall, at the convening of each regular session thereof, chose from among its own members a permanent president of the Senate, who shall be its presiding officer. The House of Representatives shall, at the convening of each regular session thereof choose from among its own members a permanent Speaker of the House of Representatives, who shall be its presiding officeh.'' Sec. 6, Art. III. ''A majority of the members present in each House shall be necessary to pass every bill or joint resolution. . All bills or joint resolutions so passed shall be signed by the presiding officer of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives.'' Sec. 17, Art. III. These provisions clearly show that ''the presiding officer of the respective Houses'' who are authorized if not required to sign ''all bills * * * passed'' by both Houses, are the ''permanent president of the Senate'' and the ''permanent Speaker of the House of Representatives.'' Therefore

the contention that the organic provision requiring "the presiding officer of the respective Houses" to sign all bills that are duly passed, means those who may be "the presiding officers of the respective Houses" while the respective Houses are in session, is not tenable. The Secretary of the Senate and the Clerk of the House of Representatives are those who are chosen as such.

The bills that have been possed in both Houses are required to be signed by the stated officers of the respective Houses, not as a part of the procedure that is essential to enactment, but for purposes of verity by designated official identification and authentication. See 36 Cyc. 963; Lewis' Sutherland's Stat. Const. (2nd ed.) Sec. 56. See also 25 R. C. L. 884; Aikman v. Edwards, 55 Kans. 751, 42 Pac. Rep. 366, 30 L. R. A. 149; Commissioners of Leavenworth Co. v. Higginbotham, 17 Kan. 62; State v. Robertson, 41 Kan. 200, 204, 21 Pac. Rep. 382; Cottrell v. State, 9 Neb. 125, text 129, 1 N. W. Rep. 1008; Taylor v. Wilson, 17 Neb. 88, 22 N. W. Rep. 119. This being so the requisite verity may be attained by the specified signatures affixed under official responsibility after adjournment, while such officials are still the officers of the respective Houses.

The organic provision is that *all* duly passed bills *shall* be signed by the presiding officers *of the* respective houses, not that such bills shall be signed by the presiding officers *in* the respective houses. The Constitution specifically designates who is "the presiding officer" of each house, and does not require the signing of bills by such presiding officers to be done during the session of the legislature. The presiding officers remain such after adjournment.

Obviously the signing of bills by the presiding officers is required, not as a part of the passage of bills, but for the purpose of identifying and authenticating the bills that

have been duly passed.   And that may be done after adjournment without violating the constitution where by inadvertence it was not done during the session.   There is no discretion to be exercised in such signing, even by the presiding officers, as in voting on the passage of bills. The presiding officers may have voted against the passage of a bill, but the organic duty to sign *all* duly passed bills is absolute, and the duty is of the same nature whteher it is to be performed by the presiding officers or by the Secretary of the Senate and the Clerk of the House.

Courts decline to compel the signing of legislative bills, not because such signing is a discretionary or strictly legislative function, but because justiciable rights arise after a bill has become a law and not pending the enactment of the bill into law.   The remedy for a refusal of legislative officers to sign a bill that has been passed in both houses, is legislative or political, and not inherently judicial in its nature.

. In this State the Journal entries prevail over the signed enrolled bill as to the passage of a bill.   Amos v. Mosley, 74 Fla. 555, 77 South. Rep. 619.   And if there is a conflict between the journal entries and the signed enrolled bill, as to the contents of the bill that was passed, the journal entries control.   State *ex rel.* Boyd v. Deal, 24 Fla. 293, 4 South. Rep. 899; State *ex rel.* Attorney General v. Green, 36 Fla. 154, 18 South. Rep. 334.

Therefore the signing of the enrolled bill by the legislative officers in open session or before adjournment is not of controlling import in the enactment of a law, as it is in States where the *enrolled Bill* and not the journal entries control (State ex rel. George v. Swift, 10 Nev. 176), or as in States where the signing is expressly required to be in open legislative session (Hunt v. State, *supra,* or where

such signing in open session is a prerequisite to the bill becoming a law (State *ex rel.* Attorney General v. Mead, *supra.* )

The essentials to enactment of a statute in this State are the due passage of a proper bill by both houses as shown by the journals and the approval of the bill by the Governor, or his failure to duly act, or due passage of the bill by the legislature notwithstanding the Governor's disapproval. The signing of a bill by the legislative officers is not a part of the descretionary passage and approval of the bill, and the signing is not required by the constitution to be in open session or before adjournment, or as a prepequisite to a bill becoming a law as in Hamlett v. McCreary, *supra;* Douglass v. Bank, 1 Mo. 20.

The constitution mandatorily requires the legislative officers to sign *all* bills duly passed by both houses, but it does not require such signing to be done in open session, nor does it make such signing a prerequisite to the efficacy of a duly passed bill. Signing a bill by legislative officers may be evidence of the identity of the bill passed by the legislature but it is not a part of such passage. If a bill is signed by the legislative officers in due time for presentation of the bill to the Governor for his action thereon, the organic mandate is complied with. To make such signing of equal import to passage by the legislature would make form of authentication a governmental power co-ordinate with the law enacting functions of the legislature, which is not required by the constitution, but is contrary to the division of powers expressly made by the constitution. Under the constitution only the Governor has power to prevent a duly passed bill from becoming a law, and this must be done within organic limitations.

It is not within the power of legislative officers by de-

sign or by inadvertance to prevent a bill from becoming a law when it is duly passed by both houses of the legislature and is duly approved by the Governor.    Likewise it is not within the power of the courts to nullify a law that has been duly passed by the legislature and duly approved by the Governor unless its provisions violate organic law.  In this case the bill was duly passed by the legislature and it is signed by all the officers who are by the constitution and the legislative rules required to sign it, and it was duly approved and signed by the Governor.

In Texas the constitution of the State provides that "the presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature, after their titles have been publicly read before signing, and the fact of signing shall be entered on the journals." Hunt v. State, 22 Tex. App. 396, 3 S. W. Rep. 233.    Other States have similar provisions.    See *In re* Contest Proceedings, 31 Neb. 262, 47 N. W. Rep. 923; State v. Kiesewetter, 45 Ohio St. 254, 12 N. E. Rep. 807; State *ex rel.* Hynds v. Cahill, 12 Wyoming, 225, 75 Pac. Rep. 433; State *ex rel.* McClay v. Mickey, 73 Neb. 281, 102 N. W. Rep. 679; Adams v. Clark, 36 Colo. 65, 85 Pac. Rep. 642; Cottrell v. State, supra; Home Tel. Co. v. City of Nashville, 118 Tenn. 1, 101 S. W. Rep. 770; 11 Ann. Cas, 824; *In re* Roberts, 5 Colo. 525.

In Missouri the Constitution provides: "No bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session." State *ex rel.* Attorney General v. Mead, 71 Mo. 266, text 269.    See also State v. Bank, 12 Rich. (S. C.) 609.

In State v. Kiesewetter, 45 Ohio St. 254, 12 N. E. Rep. 807, the Governor "had no part in the approval or authentication of laws."    Therefore authentication by the pre-

siding officers in the presence of the legislature was held to be essential under a constitutional provision that "the presiding officer of each house shall sign, publicly in the presence of the house over which he presides, while the same is in session and capable of transacting business, all bills and joint resolutions passed by the general assembly."

The organic provision imposes on "the presiding officer of the respective Houses" and upon the Secretary of the Senate and the Clerk of the House of Representatives an imperative constitutional duty to sign *all* bills that are duly passed by both houses of the legislature.    Such duty contemplates performance by signing to verify the authenticity of *all* the bills that have been passed; and that the signing shall be in such manner and at such time as will secure the presentation of all such bills to the Governor in due season for his action thereon.    Of course the signing of bills by the legislative officers should for safety and orderly procedure be done in open session as prescribed by the legislative rules of procedure; but if by inadvertence as in this case the duty to sign is not performed before adjournment of the legislature for the session, the constitutional duty remains; and if such signing can be done after the adjournment in time for the Governor to consider and take action on the bills within the time allowed him by the constitution, it should be done even though the legislative rules provided for such signing by the legislative officers during a session.    36 Cyc. 959.    The duly elected presiding officers of the two Houses and the Secretary of the Senate and the Clerk of the House of Representatives remain such until the expiration of their respective terms of office, or until their successors in office are chosen.    Section 2, Chapter 8408 Acts of 1921, provides for duties and for the compensation of the Secretary of the Senate and the Clerk of the House of Representatives to continue for 15 days

after the adjournment of the legislature, which necessarily recognizes their continuance in office for that length of time at least.   See also Senate Concurrent Resolutions No. 29, page 461, Acts of 1921; page 2793 Senate Journal of 1921; page 3583 Journal of the House of Representatives of 1921.    The journals of the last days of the legislative session are completed, printed, verified and filed, and the records of the legislative session are completed, assembled and filed in the office of the Secretary of State by the officers of the respective houses, after the final adjournment of the legislature.   Sec. 2, Chap. 8408 Acts of 1921; Sec. 94 Rev. Gen. Stats. 1920.

The president of the Senate, if a hold over Senator, as he invariably is, continues after adjournment to be the "presiding officer" of the Senate until the next regular session.

The Speaker of the House of Representatives continues after adjournment to be the "presiding officer" of the House of Representatives until his term expires at the next general election.

As the bill in question was duly passed by both houses and as the yea and nay vote on final passage was entered on the journals, and as the vote on final passage was not reconsidered, it became the duty of the officers of each house to sign the bill; and in the absence of controlling provisions of law it was not illegal or improper for the bill to be enrolled and for the officers of each house to sign the bill after adjournment of the legislature, and for the bill to be received by the Governor for his action thereon under the circumstances alleged in the bill of complaint.   See People v. Rose, 167 Ill 147: Dow v. Beidelman, 49 Ark. 325, 5 S. W. Rep. 297; Langford v. Somerset Co., *supra;* Houston & Texas Cent. R. Co. v. Odum, 53 Tex. 343.   No improper conduct of anyone is even suggested.

If the provision "all bills so passed shall be signed by the" stated legislative officers, has reference to the document actually containing the provisions when they are being voted on, which is the engrossed bill, then the enrolled bill is not required by the constitution to be signed by the legislative officers, and it is not alleged that the legislative officers did not during the session sign the bill referred to by the constitution. The statute requires the bill that has been passed, to be enrolled before it is presented to the Governor, but not before it is signed by the legislative officers. The enrolled bill is a typewritten copy of the engrossed bill. Sec. 82 Rev. Gen. Stats. 1920. The endorsements on the enrolled bill as to the passage of the bill in each house, which presumably are the same as those on the engrossed bill, indicate that the endorsements on the engrossed bill used when the measure was being voted on, are that the bill passed the House "this 28th day of May," and that it passed the Senate "this 2nd day of June." This explains the wording of the endorsements on the enrolled bill as to the date of the passage of the bill in each house.

Under the statute the bill should have been and apparently was "duly enrolled in black record ink, by typewriting machines on paper." The signing by the legislative officers impliedly certified that the enrolled bill was properly examined and compared with the engrossed bill and verified before it was authenticated by the official signatures of the legislative officers. The Chairman of the Enrolling Committee of the House where the bill originated, signed an endorsement on the enrolled bill that it has been "examined and found correctly enrolled." The bill on file appears to have been enrolled as required by the statute and to have been signed by all the legislative officers who are by the constitution and by the legislative rules required to sign it. The presentation of the bill to the Governor is not required

by the constitution to be any particular form or means of transmission; and after the filing of the bill authenticated as stated by the signatures of the legislative officers and duly approved and signed by the Governor, in the office of the Secretary of State within the time limited by the constitution, the presentation of the signed enrolled bill to the Governor by those who signed it, or who had at least some authority or duty in the premises, must be assumed. The engrossed bill which is the original that is used on final passage in each house, having appropriate endorsements thereon, is by statute (Sec. 94. Rev. Gen. Stats. 1920), required to be also filed with the Secretary of State by the Secretary of the Senate or the Clerk of the House of Representatives as the bill originated in one or the other legislative body. This aids in sustaining the verity of the enrolled bill that is authenticated by the signatures of the legislative officers and acted on by the Governor.

In State ex rel. Scarborough v. Robinson, 81 N. C. 409, the Governor had no part in approving or authenticating acts of the legislature; and under the peculiar provisions of the constitution it was held that the signing of a bill by the presiding officers of the legislature was necessary to the completeness and efficacy of the legislative act. But see the later cases State ex rel. Cook v. Meares, 116 N. C. 582, 21 S. E. Rep. 973, and Wrought Iron Range Co. v. Carver, 118 N. C. 328, 24 S. E. Rep. 356.

In Nevada and Iowa the enrolled bill is conclusive as to the enactment of the law, therefore authentication by the presiding officer is held essential.    See 151 N. W. 81; 10 N. W. 167; 26 Nev. 93. See also 141 Ind. 281, 60 L. R. A. 671.

In Lynch v. Hutchinson, 219 Ill. 193, 76 N. E. Rep. 370, it was held that an act was invalid because it was not sign-

ed by the President of the Senate. In State *ex rel.* Nebraska State Ry. Commission v. Missouri Pac. R. Co. 100 Neb. 700, 161 N. W. Rep. 271 the failure of the presiding officer of the Senate to sign an act did not affect its vali dity when it had been approved by the Governor.     Taylor v. Wilson, 17 Neb. 88, 22 N. W. Rep. 119.     In this case the Act is signed by all the legislative officers and duly approved by the Governor.     See Harwood v. Wentworth, 162 U. S. 547; Leser v. Garnett, 258 U. S. 130, 42 Sup. Ct. Rep. 217, April 1, 1922.                 •

The organic provision that ''every bill that may have passed the legislature shall, before becoming a law, be presented to the Governor,'' requires only that the bill shall be presented to th Governor *before becoming a law.*     A bill passed, as in this case, within five days before adjournment, of the legislature does not become a law until ten days after adjournment, unless it is sooner approved by the Governor. The constitution does not prescribe how or by whom a bill shall be presented to the Governor, but it contemplates that it be done in time fixed for executive consideration and action before the expiration of the time for that purpose. The constitution also contemplates that bills may be passed at any time up to the hour of final adjournment.

In this case the Governor received the bill on June 4th, the day after the adjournment of the legislature and approved it on june 10th.     See Lankford v. Somerset Co., *supra.*

All the essentials of the due passage and approval of the bill were fully complied with, and no prerequisite to the effectiveness of the act was omitted, therefor it is a law, and the courts have no authority to invalidate it.     Where the legislative and executive departments do not violate or-

ganic law in enacting statutes, the judicial department has no power in the premises.

WEST, J. concurs.

## On Petition for Rehearing.

ELLIS, J.—An Act of the legislature, as appears by an enrolled bill on file in the office of the Secretary of State, bearing the signatures of the speaker and chief clerk of the House of Representatives, the president and secretary of the Senate and the Governor of the State of Florida showing that it passed the House of Representatives May 28th, 1921, the Senate June 2nd, 1921, and was approved by the Governor June 10th, 1921, is attacked as an act which had not become a law under the constitution because it had never been presented to the Governor by the legislature as required by the provisions of Article III, Section 28 of the Constitution.

That section of the constitution is as follows: "Every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor; if he approves it he shall sign it, but if not he shall return it with his objections to the House in which it originated, which House shall cause such objections to be entered upon its journal, and proceed to reconsider it; if, after such reconsideration, it shall pass both Houses by a two-thirds vote of the members present, which vote shall be entered on the journal of each House, it shall become a law. If any bill shall not be returned within five days after it shall have been presented to the Governor (Sunday excepted), the same shall be a law, in like manner as if he had signed it. If the legislature, by its final adjournment, prevent such action, such bill shall be a law, unless the Governor, within ten days after the adjournment, shall file such bill, with his ob-

jections thereto, in the office of the Secretary of State, who shall lay the same before the legislature at its next session, and if the same shall receive two-thirds of the votes present it shall become a law.''

It is apparent from the language of the above quoted section of the Constitution that before a bill which may have passed the legislature can become a law it must be presented to the Governor by the legislature. The method of presenting it to the Governor may be immaterial so long as the legislature presents it. Some courts hold that where the Constitution requires the presiding officers of the two houses to sign the bill, such signing in *open session* of an enrolled bill is a presentation to the Governor. That it is an official attestation by the two houses of such bill as one that has passed. It is a declaration by the two houses through their presiding officers to the Governor that a bill thus attested has received in due form the sanction of the legislative branch of the government and that it *is* delivered to him in obedience to the constitutional requirement that all bills which pass the legislature shall be presented to him. Such is the holding in Field v. Clark, 143 U. S. 649, 36 L. Ed. 294, in which case there was under consideration an Act of Congress, the court holding that the signing of the bill by the speaker of the House of Representatives and the president of the Senate in open session was a presenting of the bill to the President by Congress.

In the case of Carr v. Coke, Secretary of State, 116 N. C. 223, 22 S. E. Rep. 16, 28 L. R. A. 737, the petition alleged that the act which was attacked was signed by the speaker of the House and the president of the Senate in the presence of each house. In so far, however, as either of these cases hold that the court has no power to enquire into the passage of an act by the legislature to determine whether

the requirements of the organic law have been complied
with by the legislature, they are not authority in this jur-
isdiction, because this court has announced a doctrine in
line with other jurisdictions holding to the contrary.    See
State ex rel. Attorney General v. Green, 36 Fla. 154, 18
South. Rep. 334.

The court speaking through Mr. Justice Whitfield in
Crawford v. Gilchrist, 64 Fla. 41, 59 South. Rep. 963, said:
"Under our system of constitutional government regulated
by law, a determination of whether an amendment to the
constitution has been validly proposed and agreed to by
the Legislature, depends upon the fact of substantial com-
pliance or non-compliance with the mandatory provisions
of the existing constitution as to how such amendments
shall be *proposed* and *agreed* to and such determination is
*necessarily* required to be in a *judicial forum* where the
Constitution provides no other means of authoritatively de-
termining such questions." Again: "The people of the
State have a right to amend their constitution, and they also
have a right to require proposed amendments to be agreed
to and submitted for adoption in the manner prescribed by
the existing constitution, which is the fundamental law. If
essential mandatory provisions of the organic law are
ignored in amending the constitution of the State and vital
elements of a valid amendment are omitted, it violates
the right of all the people of the State to government regu-
lated by law.    It is the duty of the courts in authorized
proceedings to give effect to the existing constitution. The
proposal of amendments to the constitution is a highly im-
portant function of government, that should be performed
with the greatest certainty, efficiency, care and delibera-
tion.    With this in view, the organic law confers this
prerogative exclusively upon the Legislature, a soverign

deliberative body, and a co-ordinate department of the State government, whose acts are independent of the other departments and subject only to the limitations contained in the fundamental organic law of the land.    The provisions of the constitution mandatorily require amendments of the constitution to be proposed by either house of the Legislature in regular session and to be "agreed to by three-fifths of all the members elected to each house" of the Legislature.  These requirements clearly contemplate that such amendments shall be agreed to by the deliberate, final, affirmative vote of the requisite number of the members of each house of the Legislature duly taken at a regular session."

In that case reference was made to the legislative journals to ascertain if the proposed amendment under consideration had been passed in compliance with constitutional requirements.

In the case of Amos v. Mosley, 74 Fla. 555, 77 South. Rep. 619, speaking through Mr. Chief Justice Browne, this court said: "It is a well settled rule in this State that where the Constitution says that 'each house of the legislature shall keep a journal of its proceedings which shall be published' and expressly requires that 'the vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the journal of each house' the journals are conclusive on the point whether the yea and nay vote was so taken and entered." And Mr. Chief Justice Mabry, speaking for the court in State ex rel. Attorney General v. Green, supra, said: "There are two conflicting views held by the decisions on this subject. Under constitutional requirements that journals of the proceedings of the legislative bodies shall be kept and published, it has been held in many decisions that where the

journal entries, as to the legislative proceedings, are explicit, and conflict even with legislative acts regularly authenticated, the journals are superior, and the courts will be governed by them as to matters clearly, explicitly and affirmatively stated therein. The other view maintained by high authority, is that the legislative act itself embodied in a bill engrossed and enrolled, and bearing the proper official signatures, is of higher dignity than the journals, and will over-ride them. This court has placed itself on the side of those maintaining the view first stated (State ex rel. v. Brown, 20 Fla. 407; State ex rel. v. Deal, 24 Fla. 293. 4 South. Rep. 899; Mathis v. State, 31 Fla. 291, 12 South. Rep. 681); and as there is ample authority to sustain this view, we will not now make any departure. It is generally held that the plain constitutional injunctions as to the mode and manner of enacting laws are mandatory, and the equally high authority that journals of the proceedings shall be kept, strengthens the view that the evidence of a compliance with such injunctions should be found in the journals. The inconvenience and danger resulting incidentally from the rule that the journals when clear and explicit as to matters proper to be incorporated therein will control, can be guarded against by a proper observance of the prescribed procedure and diligent attention to the making and preservation of the requisite journal evidence. But while the journals will control, under the rules announced by this court, as to the legislative proceedings, it is proper to observe, in language used by Judge Cooley, and quoted by this court, that whenever the Legislature is acting in the apparent performance of its legal functions, every reasonable presumption is to be made in favor of the action of a legislative body; it will not be presumed in any case, from the mere silence of the journals, that either House has exceeded its authority or disregarded

a constitutional requirement in the passage of legislative acts, unless where the Constitution has expressly required the journals to show the action taken, as, for instance, where it requires the yeas and nays to be entered. State ex rel. v. Brown, 20 Fla. 407. As all bills and joint resolutions that pass both Houses of the Legislature are required to be signed by their respective presiding officers, and also by the secretary of the Senate and clerk of the House of Representatives, an act thus *authenticated* and approved by the Governor will not be set aside unless the journals affirmatively and explicitly show that the constitutional requirements have not been observed, except where the Constitution requires the journals to show the action taken, and then their silence will be fatal. An examination of the journals of the two Houses of the Legislature, which must control us, leaves no room to doubt that the title of the act as it passed both Houses differs, in the particulars mentioned, from the title of the enrolled bill approved by the Governor. The journal evidence of this fact is affirmative and explicit.

It is settled by this court that the Governor acts as a part of the law-making powers of the State in approving bills passed by the Legislature, and unless substantially the same bill that passed the two Houses of the Legislature is submitted to the Governor for his approval, it cannot become a law by his approval, or silence, or against his approval. Advisory Opinion, 23 Fla. 297, 6 South. Rep. 925; State ex rel. v. Deal, 24 Fla. 293, 4 South. Rep. 899.''

Much that is contained in the above quotation is *obiter dictum*. The court had under consideration merely the question whether an enrolled bill on file in the office of the Secretary of State bearing the signature of the speaker and chief clerk of the House of Representatives and pre-

sident and secretary of the Senate and Governor of the State could be successfully impeached by the legislative journals on the ground that the title of the act as it passed the legislature was different from the one appearing upon the enrolled bill after the formalities of signing by the presiding officers of the two houses of the legislature and the respective clerks of each house and approval by the Governor had been complied with. The answer to that question was in the affirmative and the reason given for the answer was that the legislative journals which the constitution required should be kept and published were evidence of superior dignity and quality than the record in the office of the Secretary of State of legislative action. In arriving at this conclusion it was pointed out that there were two lines of authorities, one holding to the affirmative of the proposition and the other to the negative. This court decided to follow the former.

The proposition that the silence of the legislative journals upon legislative action which the constitution does not expressly require to be recorded in the journals of the two houses shall not be taken as evidence that the required legislative action was not taken but on the contrary every reasonable presumption is to be made in favor of the action of the legislative body was announced in the case of Mathis v. State, 31 Fla. 291, 12 South. Rep. 681, for the first time in this State. The question arose upon the validity of the enactment of the Revised Statutes.

The court held that all the proceedings in reference to the adoption of the Revised Statutes required to affirmatively appear on the journals were there recorded and rejected the contention that there was nothing to show that the Revised Statutes accompanying the bill were read and the further objection that there was nothing to identify the

Revised Statutes on file in the Secretary of State's office being the same revision of the statutes which was before the legislature accompanying the bill providing for their adoption.

In case of State ex rel. Boyd v. Deal, 24 Fla. 293, 4 South. Rep. 899, the court speaking through Mr. Justice Raney held that the Governor acts as part of the law making power of the State in approving a bill passed by the legislature. The function is not of an executive but of a legislative character. The question arose upon the validity of the Palatka charter and the decision was by a divided court. Mr. Chief Justice Maxwell, who delivered the dissenting opinion, questioned the accuracy of the loosely expressed idea that the Governor in approving a bill passed by the legislature acted in a legislative character and pointed out that his approval was not essential to the validity of a bill passed by the legislature and presented to him. But in 1887 the justices of the court in an advisory opinion to Governor Perry said that when the Governor was required by the constitution to do any act which is an essential prerequisite to the enactment of laws, such act is legislative in character and is performed by the Governor as a part of the lawmaking power and not as the law-executing or executive power.

Advisory opinions however do not have the same force and effect as primary authority as decisions of the courts for the obvious reason that they are given in the nature of advice to the executive without the benefits derived from a litigated point on which the court has the advantage and aid of counsel's argument. They are not judicial decisions but merely the expression of the opinion of the individual justices and accordingly without binding effect in a subsequent judicial proceeding before the court. See

Laughlin v. City of Portland, 111 Maine 486, 90 Atl. Rep. 318; Woods v. City of Woburn, 220 Mass. 416, 107 N. E., Rep. 985, Ann. Cas. 1917A 492 and note.

The reasoning of Judge Maxwell in opposition to the suggestion that the Governor acts in a legislative capacity while approving a bill appears to me as most cogent. Each branch of the government necessarily at times either by express provision of the constitution or in the orderly administration of the State's affairs comes in contact with one or the other branch, but such contact in no wise merges the functions of one into that of the other. It appears to me as accurate to say that the court acts in a legislative capacity when it declares an act of the legislature to be unconstitutional as to say that the Governor so acts when he vetoes a bill. There would seem to be greater reason for the first proposition than the latter, because when the court declares an ac invalid it destroys its effect, but a bill passed by the legislature may become a law the Governor's veto notwithstanding.

Before a bill passed by the legislature can become a law it must be presented to the Governor by the legislature. Our system of government thus provides two checks upon legislative action, one a check, not however complete, by the executive, and the other a complete check by the judicial branch when a cause arises in due form and the court deems the legislative action to have been in violation of the express or necessarily implied limitations of the constitution but in neither case does either official, the Governor or the judges, act in a legislative capacity.

According to this view, therefore, an enrolled bill bearing the signatures of the presiding officers of the two Houses and their respective clerks which is presented to the

Governor in the manner which the usage, the orderly con-, duct of legislative procedure and the rules under which the, two bodies have ever acted and the express mandatory pro-. visions of the constitution requiring its presentation to the Governor marks the termination of legislative action in re-' gard to it.

When such bill receives the approval of the Governor and. is signed by him and filed with the Secretary of State it becomes an executive record importing verity as to the or-, derly presentation of the bill to him as one which had pass-ed the legislature which fact is essential to its becoming a law.

The constitution definitely in most unequivocal terms, explicity and unreservedly requires certain procedure to be followed by the legislature in the passage of a bill or joint resolution, and those requirements are that on final passage the bill shall be read by sections, the yea and nay vote shall be taken, the presiding officers of the respective. houses and the secretary of the Senate and clerk of the House. of Representatives shall sign the same and the yea and nay vote on final passage in each house shall be entered on the respective journals. See Sect. 17 Art. III Constitu-, tion.

The reason for requiring the signatures of the presiding officers and clerks of the two Houses is clearly expressed in the case of Field v. Clark, *supra,* by Mr. Justice Harlan,. whose aid, speaking of the Constitution of the United: States, "although the constitution does not expressly re-quire bills that have passed Congress to be attested by the. signatures of the presiding officers of the two houses, *usage,* the *orderly conduct* of *legislative* proceedings and the rules; under: which the two bodies have acted since the organiza-'

tion of the government require that mode of *authentica-tion.*" He then proceeds to say that such signing *"in open session* of an *enrolled* bill is an *official attestation* by the two houses of *such* bill as one that has passed Congress. It is a *declaration* by the *two houses* through their presiding officers to the President that a bill thus attested has received in due form the sanction of the legislative branch of the government and that it is delivered to him in obedience to the constitutional requirement that all bills which pass Congress shall be presented to him.''

The constitution of Florida, as herein before stated, contains a provision identical in meaning with that of the Constitution of the United States as to the action the legislature shall take after a bill passes that body. In the case of the Federal Constitution the language is: ''Every bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a law, be presented to the President of the United States.'' The language of the Constitution of Florida is: ''Every bill that may have passed the legislature shall, before becoming a law, be presented to the Governor.'' In addition, the Constitution of Florida requires the signing by the presiding officer of the two Houses and their clerks.

It seems to the writer that to hold these provisions of the organic law to be directory, that the signing of the bills passed may be done after the legislature has adjourned *sine die* and cannot reassemble except upon call by the Governor under the constitutional provisions for calling extraordinary sessions, that after such adjournment the bill may be enrolled and the signatures of the officers written upon a blank sheet of paper which is afterwards used as a cover for the so called enrolled bill, is to trifle with language, make a sport of the greatest powers committed

by the people to their representatives in legislature assembled, to ignore the solemn mandates of organic law, and open wide the door to fraud which designing persons may desire to perpetrate upon the people in the name of legislation. What becomes of the legislative attestation, in such case, that the bill so signed is the one that passed the legislative body, which the Supreme Court of the United States deemed so essential to orderly and exact legislative proceedure?

The Constitution of Iowa adopted in 1857 contains a provision that "every bill having passed both Houses, shall be signed by the speaker and president of their respective Houses." The Supreme Court of Iowa held this provision to be mandatory. See State ex rel. Hammond v. Lynch, 169 Iowa 148, 151 N. W. Rep. 81, L. R. A. 1915D 119; Cooley's Constitutional Limitations 94.

Judge Cooley says "It is the province of an instrument of this solemn and permanent character: to establish those fundamental maxims, and fix those unvarying rules by which all departments of the government must at all times shape their conduct; and if it descends to prescribing mere rules of order in unessential matters it is lowering the proper dignity of such an instrument and usurping the proper province of ordinary legislation." The Supreme Court of Iowa holds that the enrolled bill on file with the Secretary of State is the ultimate proof of its passage in the form there appearing and that beyond this the courts cannot go in ascertaining whether the legislature complied with the requirements of the Constitution. This court, however, as has been shown, holds to the contrary view on that point.

The Constitution of Texas 1876, Sec. 38. Art. III requires the bill passed by the legislature to be signed by the speakers of the two Houses in open session, and the fact of sign-

ing to be entered on the journals.    The court held the provision to be mandatory and that the journals could be received in evidence to show that the requirements had not been complied with, notwithstanding the enrolled bill signed by the two speakers and the Governor was on file with the Secretary of State and in so holding repudiated a contrary rule broadly announced in prior decisions.    See Hunt v. State, 22 Texas App. 396, 3 S. W. Rep. 233.

In the case of People *ex rel.* Akin v. Rose, 167 Ill. 147, 47 N. E. Rep. 547, the question is not discussed at all.    The petition for mandamus to require the Secretary of State to file the bill and authenticate the same while it recited the fact that the bill was enrolled and signed after the legislature adjourned presented the only point raised by the Secretary of State for refusing to file the same, which was that the bill had not been presented to the Governor for approval within ten days after the adjournment of the General Assembly.    The court awarded the mandamus in a modified form, directing that unless the Governor should veto the bill before the ten days elapsed and return the same with his objection the writ would issue.    The decision was announced orally upon the facts stated in the petition. The only question considered was the construction of the term "within ten days after adjournment."

I am persuaded that the following propositions are sound and are the law in this State:

1st.    The provision contained in Section 17, Article III, of the Constitution requiring the presiding oficers and the clerks of each house of the legislature to sign all bills and joint resolutions passed is mandatory.

2nd.    That such signing of bills and joint resolutions must be done in open session of the House over which the,

officer signing is then presiding and to which the clerk signing is attached.

3rd.   That no bill passed by the legislature can become a law until it has been presented by the legislature to the Governor.

4th.   That such presentation can be made by the legislature only while in session.

5th.   That the enrolled bill on file with the Secretary of State showing upon its face to have been signed by the presiding officers of the two Houses and their respective clerks before the legislature adjourned and to have been approved by the Governor is *prima facie* evidence that all mandatory provisions of the Constitution as to the requirements to be observed by the legislature in the passage of the bill, signing by the officers and presentation to the Governor, have been complied with.

6th.   That such *prima facie* evidence may be overcome by reference to the journals of either house, which if they affirmatively show such mandatory provisions were not complied with the so called act of the legislature must fail.

7th.   That the approval by the Governor of a bill which has passed the legislature, is a certification by him that the bill after its passage was presented to him while the legislature was in session.

; 8th.   That the Governor's approval of a bill passed by the legislature constitutes an executive record which imports the same verity, is as solemn and dignified an act and entitled to the same faith, credit and respect as the records of a court or those of the legislature.

9th.   That the silence of the journals of the legislature upon the question of whether the bill passed by the leg-

islature was signed by the presiding officers of the two houses and their clerks does not overcome the *prima facie* evidence of regularity afforded by the enrolled bill on file with the Secretary of State, bearing upon its face the approval of the Governor and the signatures of the presiding officers of the two houses of the legislature appearing to have been attached before the legislature adjourned.

The allegations of the bill charge the Governor, the president of the senate, the speaker of the house of representativs and the clerks of the two houses with conduct involving a disregard of the mandatory provisions of the constitution. Not conduct of a fraudulent or arbitrary character evincing disrespect of their obligations to the State, but of official action nevertheless which misrepresents the circumstances under which their names were signed to the bill.

If, for instance, the officers of the two houses signing the bill under the extraordinary circumstances alleged in the complaint had frankly stated the fact, and the Governor had likewise stated over his signature the circumstances under which the bill came to his possession, the question would have been fairly presented upon the record made and the people would have been fully and accurately informed of the facts, and the question could have been determined by the courts squarely upon the proposition of whether the signing of a bill by the presiding officers of the two Houses was mandatory and whether such signing was required to be done in open session.

As it is the determination of these vital questions, involving as they do the powers of the legislature, the safeguarding of the peoples rights from abuse that in a different case under a different administration at another time, people of conscienceless characters and designing motives

may desire to practice upon the people for selfish ends becomes unnecessary and the issue may be made to turn upon a rule of evidence or pleading.

If the allegations of the bill of complaint are true and the court holds the bill passed by the legislature to be valid notwithstanding, it is high time that the people of the State of Florida should be informed of the facility with which plain mandates of the constitution imposed by them upon their representatives in legislature assembled may be ignored by their representatives and the case with which the courts of the land may be prevailed upon to facilitate such practices by interpretation of words, construction of language which emasculates and devitalizes the living words of the people written by them in their Constitution to limit the powers of their servants to the end that liberty and the pursuit of happiness may be secured to them and their posterity.

But the question presented in this case becomes one of pleading and later possibly one of evidence.

It is not correct, as stated in the petition for rehearing, that the presumption of facts arising from the enrolled bill in the Secretary of State's office is a nontraversable fact. Nor is it in any sense true that the bill imports absolute verity. Its validity may be attacked as successfully as the verity of any other record. The power to correct error is inherent in all governments. As pointed out, this court will have recourse to the legislative journals to determine in some cases whether an act of the legislature duly signed and approved and on file with the Secretary of State is valid legislation.

The signature of the Governor to the bill on file with the Secretary of State makes the document an Executive Rec-

ord. It implies that the bill came to him in due course while the legislature was in session pursuant to the clear and unmistakable language of the Constitution. The bill of complaint charges a state of facts contradictory of the clear implications of the record. A state of facts which if true would vitiate the record and render it void and of no effect. But may the record be attacked collaterally? Has the Comptroller by the Attorney General the power to admit a state of facts which would impeach an Executive Record and destroy its effect, a record in the making of which he had no part?

Assuming that the complainant as a citizen and tax payer may maintain his bill to test the validity of the act, if he relies upon the misconduct of officials to impeach the record should they not be parties? Or if he relies upon the affirmative declarations of the legislative journals to sustain the truthfulness of his allegations, should he not allege that the journals contain such affirmative evidence of the invalidity of the act? In the event of issue joined upon the allegations of fact contained in this bill and the journals are silent as to the enrolling and signing of the bill how is the proof to be made? Will the speaker of the House or President of the Senate, or Governor, be permitted to testify to any fact that would impeach the official record?

These questions were not considered in the majority opinion nor in the minority opinion filed by Mr. Justice Whitfield and concurred in by Mr. Justice West. I consider them essential to be considered in the determination of the question raised upon demurrer and for the reason given I favor the granting of a rehearing in this case and so vote.

## On Rehearing.

ELLIS, J.—Upon the first hearing in this case the court was divided upon the question, whether a bill duly passed by the legislature was required by the constitution to be signed by the presiding officers of the two Houses and respective clerks thereof, during the legislative session and by the legislature presented to the Governor. A majority of the court holding to the affirmative view.

There was no difference of opinion as to the mandatory character of the two provisions, one requiring all bids passed to be signed by the presiding officers of the respective Houses and by the Secretary of the Senate and the Clerk of the House of Representatives, Section 17, and the other which provides that every bill that may have passed the Legislature shall, before becoming a law, be presented to the Governor, etc., Sec. 28, Article III. The division arose upon the proposition that these requirements were to be observed while the legislature was in session. The majority holding the affirmative of the proposition.

That view seeming to the majority to be the more reasonable in the light of Section 28 of Article III which requires the Governor to return the bill to the House in which it originated with his objections if he does not approve it; and provides that if it is not returned within five days after it shall have been presented to the Governor it shall be a law in like manner as if he had signed it, and that if the legislature by its final adjournment prevents such action, the bill shall be a law unles the Governor within ten days after the adjournment, shall file the bill with his objections thereto in the office of the Secretary of State.

In the view of the writer, the purpose of the section clearly being to grant to the Governor five days while the legis-

lature is in session in which to exercise the power of veto and as to all bills presented to him during the last five days of the legislative session, ten days additional in which to exercise his power of veto. Section 28 of Article III is the only section in the constitution relating to the Governor's veto power except Section 18 of Article IV relating to the disapproval by him of any items of any bills making appropriation of money. But the veto power is of as great dignity and as salutary a provision as any relating to the powers conferred upon any branch of the government. It was designed as a check upon errors or a protection of the constitutional rights of the people against abridgements.

As said by Mr. Ordronaux in his work on Constitutional Legislation, the veto power is capable of being expressed in precise numbers. It is represented by the difference between a majority vote and a two-thirds vote. In 1921 the Governor's veto power therefore was equal to eighteen votes. This number, of course, may be reduced if when the veto is considered, a bare majority of the House considering it is present. But neither that fact nor the thought that the veto power may be exercised because of differences that may exist between the executive and the legislature on questions of policy and therefore much of its moral weight is lost and no longer shakes the confidence of the people in the honesty or capacity of their representatives, can destroy the dignity or importance of the powers vested by the people in their Chief Executive. It is not a personal privilege to be waived aside by the Executive, it is a power vested in the office in trust to be exercised to the end that its full purpose may be realized in the orderly transaction of legislative business. It cannot be lengthened nor abridged either by the legislature, nor its presiding officers.

Yet, the view that the mandatory requirement of the constitution that all bills passed by the legislature shall be signed by the presiding officers of the two Houses and the respective clerks thereof may be complied with by those officers after the legislature adjourns and then presented to the Governor so long as it is done within ten days after adjournment by the legislature *sine die,* leads to the inevitable conclusion that the time secured by the constitution in which the Governor may exercise the veto power may be abridged by the Speaker of the House, or the President of the Senate or the Clerk of either House, unless a further modification of the rule is made to the effect that the signing by those officers of a bill passed may be done after the bill has been presented to the Governor and after he has signed it. But even in such case the bill must have been presented to the Governor before the legislature adjourned in order that the ten days fixed by the constitution in which the power of veto may be exercised shall not be abridged.

So to the majority in the first hearing of this case the conclusion seemed to be unescapable that the constitution required that all bills passed by the legislature should be signed by the presiding officers of the two Houses and the respective clerks thereof while the legislature was in session and that the legislature should then present the bills so passed to the Governor as required by Section 28 of Article III of the constitution. Such was the interpretation of the constitution made by the legislature itself, as shown by the legislative rules of procedure referred to in the minority opinion.

A power vested by the constitution in the Executive branch of the government which is equivalent to one-sixth of the legislative power in the enactment of laws and de-

signed as a check upon legislative errors or abridgments by that body of the peoples' rights, is not one to be interfered with by the legislature itself nor any of its officers or clerks, nor to be abridged by any of them upon the plea of inattention to duties or negligence in the discharge thereof nor upon any other pretext whatever. It seems unreasonable to a degree to suppose that the legislature can by delaying the presentation of a bill passed by it, to the Governor, until after adjournment if presentation is then possible, prevent the Governor from having the time for consideration which is intended by the constitution.

But the first question presented in this case is one of pleading. The bill alleges that the mandatory requirements of the constitution relating to the signing by the presiding officers of the two Houses of the legislature and their respective clerks of the bill passed and presentation of it to the Governor were not complied with. That the bill was not signed by the two presiding officers nor the clerk of each House, nor presented to the Governor by the legislature, nor did it reach his hands until after the legislature had adjourned *sine die.*

That the document on file in the office of the Secretary of State, purporting to be an Act of the legislature approved by the Governor on June 10th, 1922, designated as House Bill No. 702 and appearing among the statute laws of the State as Chapter 8411 against the enforcement of which by the Comptroller of the State an injunction was prayed, was not written until after the legislature adjourned, was not signed by the presiding officers of the two Houses of the Legislature during the session but they signed their names upon the document Sunday, June 5th, 1921, which was one full day after the legislature adjourned. That the Governor, in whose possession the document then

was, but into whose hands it had not come until after the legislature had adjourned *sine die,* signed it on the 10th day of June, 1921, in full knowledge of all the irregularities alleged, and then transmitted it to the office of the Secretary of State.

A demurrer to the bill was interposed by the Comptroller. The two grounds presented being that the bill did not make such a case as entitled the complainant to the relief sought and that the bill showed no right in the complainant to the relief prayed.

The bill of complaint attacked the constitutionality of the statute from two positions. First, that it had not become a law because it had not been presented to the Governor nor signed by the presiding officers and clerks of the two Houses of the legislature as required by the constitution, and secondly, that the act even if regularly passed is void because it is an unauthorized attempt by the legislature to impose other than a license tax or an ad valorem tax on property. That it is an unlawful and unreasonable discrimination between persons and classes of persons selling gasoline and other products and violates Section 12 of the Declaration of Rights and is void for other reasons.

In the consideration of the case the court has discussed only the first ground of attack and in the first opinion held the act to be void because of the irregularities alleged. The rehearing was then granted, which reopens that question, so that the court now has before it for consideration the two grounds or positions of attack made by the bill of complaint.

Upon the first ground of attack certain facts referred to herein were alleged in the bill of complaint. It is contended that the demurrer admits those facts so alleged for the

purpose of this argument. And the facts being admitted show a violation of mandatory provisions of the constitution in the attempted exercise of legislative power in the enactment of the bill attacked. But the question which we meet upon the very threshold is, how can those facts be known. A demurrer admits the truth of all essential matters of fact as are well and sufficiently pleaded. See Shone et al. v. Bellmore, 75 Fla. 515, 78 South. Rep. 605; Capital City Bank v. Hilson, 64 Fla. 206, 60 South. Rep. 189.

But a demurrer does not admit as true allegations which the law would not allow to be proved, nor facts that are inconsistent with law. See Brown v. Avery, 63 Fla. 355, 58 South. Rep. 34, Ann. Cas. 1914A 90n; Owen v. Baggett, 77 Fla. 582, 81 South. Rep. 888; Rivers v. Brown, 62 Fla. 258, 56 South. Rep. 553; 81 Fla. 805.

In the case of Brown v. Avery, *supra,* a petition attacked a document which upon its face appeared to be a will by alleging facts showing that neither at the time it was made nor afterward was it intended by the maker to be her last will and testament. Parol testimony was necessary to establish the facts alleged and such facts would have the effect of varying the meaning of the instrument, so that such facts so alleged were necessary to establish the grounds of the petition. A demurrer was interposed to the petition and it was sustained. Upon appeal this court affirmed the ruling holding that parol evidence is inadmissible for the purpose of showing that an instrument purporting to be a will, fair and regular upon its face, properly executed as such, was not intended to operate as a will. The demurrer, therefore, did not admit the facts alleged. The court referred approvingly to Rivers v. Brown, *supra,* holding that a demurrer was properly sustained to a plea which

sought to lay the foundation for the introduction of parol testimony to contradict the terms of a written instrument upon which the action was based.

So the point in pleading is well established in this State that allegations of fact not susceptible of proof are not admitted by a demurrer to a pleading in which such allegations of fact appear.

That doctrine brings us to a consideration of the question whether the allegations of fact contained in the bill of complaint and which are relied upon to prove that the document on file in the office of the Secretary of State and designated as Chapter 8411 Laws of Florida is not an Act of the legislature because it was never presented by that body to the Governor and was not signed during the legislative session by the presiding officers and clerks of the two Houses, are susceptible of proof by parol evidence, or other means aliunde the legislative journals.

We say *aliunde* the legislative journals because it was admitted in the oral argument and reference to the journals confirm the admission that nothing therein contained supports the allegations made. So that if the complainant was put to proof of the facts alleged he must rely upon parol evidence or upon other means of proof to support the allegations of fact.

It may also be stated as a fact shown by the legislative records in the office of the Secretary of State who under the constitution is the legal custodian of all records of official acts of the legislative and executive departments that House Bill No. 702 designated as Chapter 8411, Laws of Florida, was duly passed by the legislature and that the yea and nay vote on the final passage was duly entered on the legislative journals of each House and that the provi-

sions of House Bill No. 702 are identical with those of Chapter 8411 or the so called enrolled bill on file in the office of the Secretary of State which is the document referred to in the bill of complaint. It is also true that the enrolled bill contains the following endorsements:

"House Bill No. 702. Passed the House of Representatives this 28th day of May, A. D. 1921, Frank E. Jennings, Speaker of the House of Representatives. B. A. Meginniss, Chief Clerk of the House of Representatives.

"Passed the Senate this 2nd day of June, A. D. 1921, W. A. MacWilliams, President of the Senate. C. A. Finley, Secretary of the Senate. Examined and found correctly enrolled. L. C. Crofton, Chairman of Committee on Enrolled Bills. I certify that this act originated in the House of Representatives. B. A. McGinniss, Chief Clerk of the House of Representatives. J. B. Shuman, Enrolling Clerk of the House of Representatives. Approved this 10th day of June, A. D. 1921, Cary A. Hardee, Governor." The legislature adjourned *sine die* June 3rd, 1921.

It is contended by the complainant's solicitor that the court will take judicial knowledge of the facts alleged in the bill of complaint. That it may inform itself by any means within its power as to the facts alleged, that it may subpoena the Governor and the men who endorsed the bill to testify when the document came to his hands and by what means and when they endorsed their names upon it. Upon the other hand, the Attorney General contends that the document which is attacked is a final legislative record, that it imports verity, is presumed to be a valid legislative enactment and cannot be attacked nor its validity denied except by an affirmative record or entry in the legislative journals showing the irregularity of its passage as alleged

in the bill or by some defect appearing upon the face of the record or contained in its language.

The bill of complaint does not charge fraud. There is no allegation that the Governor and the presiding officers and clerks of the legislature conspired to impose a fraud upon the people of the State, nor that the officials named were guilty of any form of political depravity, but the bill rests in the last analysis as to the first ground of attack upon the statement that the document is not a record of an executive or legislative act because the officers of the legislature did not sign it during the session of the legislature nor was it presented to the Governor by that body. And it is contended that as there was no signing of the bill during the session and no presentation to the Governor by the legislature, that there could be no record in the legislative journals upon the subject and therefore the document could not become a record of either an executive or legislative act, that it is a spurious, illegitimate, counterfeit thing of no virtue whatsoever.

If the document as it appears on file in the office of the Secretary of State is a record of an official act of either or both the executive and legislative departments, then it imports verity, is *prima facie* valid and may not be impeached, discredited by any evidence which is of less dignity, and as the legislative journals constitute the only evidence superior in dignity to the record of the legislative act required by the constitution to be kept by the Secretary of State it may be impeached only by such journals and unless they affirmatively show the irregularities charged, the document stands unimpeached as the record of a legislative act. State ex rel. Attorney General v. Green, 36 Fla. 154, 18 South. Rep. 334; State ex rel. v. Brown, 20 Fla. 407; State ex rel. Boyd v. Beal, 24 Fla. 293, 4 South.

Rep. 899; Mathis v. State, 31 Fla. 291, 12 South. Rep. 681; Amos v. Mosley, 74 Fla. 555, 77 South. Rep. 619; Wade v. Atlantic Lumber Co., 51 Fla. 628, 41 South. Rep. 72; State ex rel. Turner v. Hocker, 36 Fla. 358, 18 South. Rep. 767; West v. State, 50 Fla. 154, 39 South. Rep. 412.

That doctrine has been invariably adhered to by this court without modification since State ex rel. v. Brown, *supra.* If therefore the document, referred to as the enrolled bill, is a record of an official act of the legislative department, the demurrer should have been sustained as to the first ground of atack because facts are alleged to impeach the record which are not susceptible of proof except by the legislative journals which it is admitted do not affirmatively sustain such allegations.

The position must therefore be taken that the so called enrolled bill which is on file in the office of the Secretary of State and which bears upon it the signatures of the presiding officers of the two Houses and their respective clerks and the signature of the Governor and that of the Chairman of the Committee on Enrolled Bills and the signature of the Enrolling Clerk of the House of Representatives, all of which are admittedly genuine signatures, is not a record of an official act of either the executive or legislative department. That, although the bill of which the document attacked is a copy passed the legislature, it never became a law because it was never presented by the legislature to the Governor and as it was never presented to him by the legislature, which is the only legal means by which it could reach the Secretary of State, the document which was endorsed as stated by the Governor and others is not such an instrument as the law provides shall be kept by the Secretary of State and cannot by mere endorsement by the Governor and legislative officers and filing in the

office of the Secretary of State be converted into a record of an official act of the legislative department.

A "bill" is a proposition reduced to writing, submitted to the consideration of the legislature, which, when it has received the endorsement or support of a majority vote of the members present of each House and yea and nay vote taken upon the final passage entered upon the journals of each House it is said to have "passed." The use of the word "bill" in Section 28 of Article III of the constitution providing that every "bill" that may have passed the legislature shall, before becoming a law, be presented to the Governor; and in the proviso to Section 17, Article III providing that all "bills" so passed shall be signed by the presiding officers of the respective Houses, etc., was not intended, as the legislature by its rules has indicated, to designate the original written document first submitted. But it has reference to the last writing which contains all the amendments and changes made by the legislature in the "bill's" journey through the two Houses. It contains the original proposition in its altered or amended form, if there have been any changes. It represents the last thought of the legislative mind. It is the repository of the latest expression of legislative purpose and intention concerning the original proposition.

That document eventually becomes an official record of a legislative act when approved by the Governor or passed over his veto. But to become such a record it must first pass from the legislature, as held by the majority in the former opinion, while in session, through some agency of its own into the hands of the Governor, whose constitutional duty it is to receive it and to approve it or return it with his objections to the House in which it originated or to the Secretary of State, with such objections, if the legislature

by adjournment *sine die* prevents its return in due time to the legislative house in which it originated.

A bill that passes the legislature and is duly presented to the Governor and duly approved by him and transmitted to the Secretary of State by his direction becomes *ipso facto* a record of an official act of the legislative department and in the custody of the Secretary of State, without the ceremony of any formal delivery to him by the Governor in person. It is immaterial whether it be a legislative or executive record or a record of both departments. It is a record of a coordinate branch of the government. It is complete, final, conclusive, unimpeachable, except perhaps for fraud, unless contradicted by records of the same department of superior or equal dignity or carries its death upon its own face.

Now the ''enrolled'' bill referred to in this case is in the keeping of the Secretary of State, on file in that office, and bears upon its face every evidence of regularity. The signatures upon it are genuine and all mandatory requirements of the constitution regarding signing by officers and clerks of the two Houses affirmatively appear to have been complied with, and the Governor's approval appears to have been given within the time allowed for consideration by him.

But the complainant says that the bill, House Bill No. 702, was never enrolled by the legislature, never signed by the presiding officers of the two Houses and the clerks thereof and was never presented to the Governor by that body. That the document attacked is a paper writing made by some unofficial person after the legislature adjourned, endorsed by the Speaker of the House and President of the Senate and other persons whose names appear thereon about the first hour of the second day after

the legislature adjourned, brought to the Governor's office by some person unofficially after the legislature adjourned and then signed by him, of which facts all of them, whose names appear upon the back of the enrolled bill, knew full well. And of these facts it is contended the court will take judicial knowledge and will inform itself by such means as lay within its power. That the facts alleged are matters of public knowledge, known generally throughout the State, will not be denied by the Governor nor any of the officers and clerks whose names appear upon the document, and are easily ascertainable by the simplest inquiry.

But what is a public record is a question of law. A public record is a written memorial made by a public officer and that officer must be authorized by law to make it. See Coleman v. Commonwealth, 25 Gratt. (Va.) 865; 2 Bouvier's Law Dictionary 429; State v. Anderson, 30 La. Ann. 557; Black's Law Dictionary.

A public record is one required by law to be kept, or necessary to be kept in the discharge of a duty imposed by law, or directed by law to serve as a memorial and evidence of something written, said or done. 23 R. C. L. 155; Robinson et al. v. Bishback, 175 Ind. 132, 93 N. E. Rep. 666, Ann. Cas. 1913B 1271; Bell v. Kendrick, 25 Fla. 778, 6 South. Rep. 868.

But it is argued that neither the Governor, the Speaker of the House, the President of the Senate nor the clerks of the two Houses were authorized by law to sign the document under the conditions under which they signed, and therefore they were not authorized by law to make of the document a public record; that it is a document which, if genuine, is of legal efficacy, if not contradicted by the legislative journals, to vest in the Comptroller the power

to collect the tax on gasoline, to do the thing which the bill of complaint alleges he is doing to the complainant's injury, but that the officials named had no authority to make that document.

Now, as every one is presumed to know the law, the officials named are presumed to have known what their authority was under the law, but it is alleged that they nevertheless deliberately did that which they were not empowered by law to do, to the end that a public record should be made evidencing a power in the Comptroller to collect a tax upon a certain commodity.

This allegation comes very near, if it does not completely, charge the officials named with falsely making a public record. And the court, it is claimed, may take judicial knowledge of the facts to place this imputation of wrong doing upon the Governor and officers of the legislature. The court has no power to take judicial knowledge of a state of facts existing *in pais* that will destroy a public record and leave the public officers, whose duty it is to make records of the transactions of their offices, under suspicion of fraudulent conduct. The "enrolled bill" on file in the office of the Secretary of State has the form and requisites of an official act of the legislature. It possesses all the indicia of a public record made within the scope of the official's power and such a record as they are required by the constitution to make and the Secretary of State to keep.

The Governor has no power to approve a document as a bill which has passed the legislature, unless it has been presented to him by that body with the signatures thereon of the presiding officers and clerks of the two Houses, yet he approved this bill and transmitted it to the Secretary of State. It follows, therefore, that his signature at-

tached to such bill in approval is equivalent to certificate by him under oath that it reached his hand in due course. It is, therefore, a public record of a coordinate branch of the State government and the judicial branch has no power to adjudge it to have been made in a manner not in conformity with the rules and regulations of law in the absence of a specific and unequivocal charge of fraud on the part of the officials concerned, or the existence of some public record of equal dignity to show the abuse of authority or violation of law by them or the forgery of their signatures.

If they have in fact assumed power and undertaken to do an act not authorized by the constitution, the remedy is with the people who may evidence their distrust of them in the elections, but for the judiciary to assume the power of exercising a supervisory ascendency over the official acts of the executive, is to assert the superior, even supreme power of the judiciary over the other departments of government. The case is not analogous to one in which the court declares an act of the legislature to be contrary to the express limitations of the constitution and therefore void. A power unique in character and wholly American in its origin. That power involves the function of determining whether the expressed will of the legislature as evidenced by the record of legislative acts is superior in authority to the expressed will of the people as evidenced by the written constitution. The courts must determine which is the superior will. If the will of the people as expressed in the constitution is superior, then it follows that the will of the legislature in opposition to it must fail. See Marbury v. Madison, 1 Cranch 137 (U. S.).

But it would be a solecism to hold that a record of a leg·

islative act, an "enrolled bill" on file in the office of the Secretary of State appearing upon its face to be regularly authenticated and possessing all the indicia of regular and orderly legislative procedure is *prima facie* valid if there exist facts of which the court must take judicial notice showing it to be void. Yet this court has adopted the journal entry rule and thus far may be said to be guilty of the solecism, but it has not gone to the extent of holding that it will take judicial notice of matters resting in parol testimony to invalidate the record of the legislative act.

No record is required to be kept of the presentation to the Governor of a bill passed by the legislature, but in this case the Governor approved the bill and sent it to the Secretary of State. That act carries with it the legal inference that it was properly presented. It cannot be presumed that what appears to have been rightfully done was fraudulently done. We must therefore hold that as a matter of law the "enrolled bill" now on file in the office of the Secretary of State is a public record of an official act of the legislative department and being such may be impeached only by the legislative journals.

The principle here announced is set forth in the case of United States v. Arredondo, 6 Pet. 691, 8 U. S. (L. ED.) 547, in the following words: "It is an universal principle that when power or jurisdiction is delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done and the public or any person denying its valid-

ity, are power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer, whether executive......legislative......judicial......unless an appeal is provided for or other revision by some appellate or supervisory tribunal is prescribed by law.''

In the case of State ex rel. Crenshaw v. Joseph, 175 Ala. 579, 57 South. Rep. 942, the Supreme Court of that State, speaking through Mr. Justice Sayre said, ''The rule here stated confines judicial knowledge to the record, where the record is authentic and complete in itself.''

The signing of the ''last writing'' on enrolled bill by the presiding officers of the two Houses and their respective clerks and presentation to the Governor is a duty imposed by the constitution upon the legislature which causes its officers to sign as an authentication of the writing as the bill which has passed, but a record of these acts is not required to be spread upon the journal. The absence of any such record therefore cannot be taken as evidence that these requirements were not observed. But on the other hand every reasonable presumption is to be taken in favor of the legislative compliance with the requirements of the constitution. See Mathis v. State, *supra.*

The Governor may not exercise his power of veto unless a bill is presented to him by the legislature, and as he may veto or approve only such bills as are passed by the legislature and presented to him by that body, the presumption exists that when he exercises the power of veto or approves the bill that it has reached him in the due and orderly course of legislative business. His action evidenced by his signature becomes a record of an official executive act, and carries with it the same implication of verity and rectitude of official conduct as the record of an official act

of any other department of government. If there are no other executive records which may impeach the particular record the latter must stand.

The bill of complaint does not allege the existence of any other executive record that would contradict or explain the record of the Governor's approval of the bill attacked, but relies upon facts which depend for proof upon oral testimony or, as counsel asserted, upon judicial notice. But if the record of an official executive act imports verity, is *prima facie* evidence of regularity, it is a contradiction to say that the court will take judicial notice of facts existing *in pais* to contradict and impeach it. So, as Mr. Justice Sayre said in State v. Joseph, *supra,* judicial knowledge is confined to the record when an official act of the legislative or executive department is called in question.

The question in that case was whether parol evidence would be received to show the point of time at which the presentation of a bill passed by the legislature was made to the Governor. The case was decided by a divided court, Messrs. Justice Simpson and McClellan dissenting, but the former seemed to be of the view that parol evidence was not admissible to contradict the record, but that records kept in the Governor's office showing the dates when bills were presented to the Governor should have been admitted, he said, "These are not in the nature of parol testimony, but constitute the official record of the history of the bill, through its various stages, until it becomes a law." Mr. Justice McClellan was of the same opinion upon that point, saying: "It has been suggested that a writing, to be a record and admissible in evidence, must be kept or made under statutory authority or command. Recourse to the highest authority on the subject demonstrates that such is not the law." He then quotes as follows: "Although a

book kept by a public officer is not required to be kept by any statute, yet, if it is necessary or proper or convenient to the adequate discharge of his duties, it is an official book, and admissible as such to prove the facts therein stated. So entries or indorsements which are necessary to a proper discharge of official duty are competent, though not expressly authorized or required by law," and cites the following authorities: 10 Ency. of Ev. pp. 716, 717 and notes thereon; White v. United States, 164 U. S. 100, 17 Sup. Ct. Rep. 38, 41 U. S. (L. Ed.) 365; 1 Greenleaf, 483-485; Evanston v. Gunn, 99 U. S. 660, 665, 25 U. S. (L. Ed.) 306; Jones on Ev. 508, 509.

With this doctrine as supported by the above authorities this court is in line. See Bell v. Kendrick, *supra.* But that the court will take judicial knowledge of facts resting in parol testimony to "advise judicial knowledge" to the end that the presumption of regularity and legality of the transaction raised by the record may be overcome, is a doctrine the soundness of which the reasoning of Mr. Chief Justice Murray in Fowler v. Pierce, 2 Cal. 165, is not convincing. He said in that case, "If a court cannot resort to parol evidence in such cases (when the question is whether the courts may go behind the record itself to ascertain if the law was passed in conformity with the requirements of the constitution) the door to all inquiry is closed, as it is impossible, from the nature of the case, to obtain any other evidence in most cases that may arise."

But that argument assumes that an executive or legislative function is subject to judicial review in the matter of its appropriate or suitable exercise. The constitution, it is true, prescribes the manner in which the powers of legislation and executive action in connection therewith shall be exercised, and such regulations and requirements are

mandatory, but no record of how they are performed, except in the matter of recording the yea and nay vote on the final passage of a bill, is required to be made. A record having been made of the legislative act and the executive act in connection with it, a presumption arises that the power was duly exercised so far as conformity to regulations and rules are concerned, and that presumption cannot be overcome by judicial notice of alleged facts showing otherwise, which is another way of saying that the record which imports verity is impeached by judicial notice that it is false.

The authorities cited in the able and lengthy briefs of counsel cannot be each considered and criticised in this opinion. To do so would extend it to an unreasonable length, if that point has not already been reached, and it would be productive of no beneficial end. The authorities are seemingly in irreconcilable conflict, but such conflict is more apparent than real. They may be divided first into two classes, those which announce the ''enrolled Bill rule'' and those holding to the ''Journal Entry rule.'' Among the latter this court has taken its place.

There are those holding to the doctrine that judicial notice will be taken of facts *in pais* to impeach the implied verity of a record of a coordinate branch of the government, and then as if in explanation of how judicial knowledge can be taken of a fact that may be personally known by only one or two or perhaps six persons at the most, they say that the court's ''judicial knowledge may be advised'' by the testimony of such persons. In other words, that any legislative act which was approved by the Governor after the legislature adjourned may be declared void by the court upon the testimony of one or two persons who would testify that the bill after passing the legislature and

signing by the officers, was not presented to the Governor until after adjournment. · And if such active litigant should get his story into some sensation loving and scandal spreading newspaper, where it would probably never be contradicted, then the court might take judicial knowledge of the fact from public notoriety upon the general principle that "What is the law is a matter necessarily and in respect of finality of pronouncement committed for decision to the judicial department when properly invited to do so." And that whether "constitutional requirements were in a particular instance observed is a question solvable alone by the court in the light of its *satisfactorily advised judicial knowledge* and so necessarily excluding the advice or service of a jury in deciding it."

·We think that the better rule is as announced by the Alabama court in the able opinion of Mr. Justice Sayre that in such matters as those which involve the regularity of executive conduct and legislative action and conformity to prescribed rules mandatory in character even, "judicial knowledge is confined to the record when the record is authentic and complete in itself." By the record is meant all official acts of the legislative and executive departments of which any written evidence was preserved as a memorial of the official acts and transactions of the office. They constitute public records of the two departments of government, and may be examined by the court to "advise its judicial knowledge," but it will not receive the testimony of witnesses to contradict a record made by a coordinate branch of the government when in the making of such record the officers were acting under the sanction of their oaths to obey the requirements of the constitution. To such a record the rule of conclusive preference applies as discussed by Mr. Wigmore. 2 Wigmore on Evidence, Sec. 1348.

There may exist no such evidence of the alleged irregularities, the court will not take judicial knowledge of the existence of such record, although when brought to its attention it may take knowledge of it, but if the record evidence does not exist, it may be possible that the irregularities in the signing and approval of the bill cannot be shown. But, as Mr. Justice Frazer said in Evans v. Browne, 30 Ind. 514: ''The framers of our government have not constituted it with faculties to supervise coordinate departments and correct or prevent abuses of their authority.'' Again, ''Human governments must repose confidence in officers. It may be abused, and there can be no remedy. Nor is there any great force in the argument which seems to be regarded as of weight by some American Courts, that some important provisions of the constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argument overlooks the fact that legislators are sworn to support the constitution, or else it assumes that they will wilfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligations.''

Mr. Chief Justice Murray in Fowler v. Pierce, *supra,* seemed to fear that if the executive approval was forged, there would be no remedy to protect the people from this imposition, but the answer to that argument is, the court will take judicial notice of the signature of the Governor. See 7 Enc. of Ev. p. 981 and note.

The arguments against conclusiveness of the record in questions involving the orderly passage of a bill through the legislature are reducible, says Mr. Wigmore, to three: 1st, That the enrollment is not a record; 2nd, Political pol-

icy, there is danger of error and fraud; and 3rd, Constitutional necessity. Which he says is the one most frequently pressed and the one really responsible for almost all of the decisions against conclusiveness. But it seems after all to be a spectral scruple, created by a false logic.

It consists, says the learned writer, in the notion that every constitutional provision is *per se* capable of being enforced through the judiciary and must be safeguarded by the judiciary because it can be in no other way. Yet there is certainly a large field of constitutional provisions which do not come before the judiciary for enforcement and may remain uninforced without any possibility of judicial remedy. After citing many instances, he proceeds: "That situation exists where the constitution enjoins duties which affect the motives, and judgments of a peculiar, independent department of government. Legislative, executive and judiciary, such duties are simply beyond enforcement by any other department if the one charged fails to perform them." "The truth is that many have been carried away with the righteous desire to check at any cost the misdoings of legislatures. They have set such stores by the judiciary for this purpose that they have almost made them a second higher legislature. But they aim in the wrong direction. Instead of trusting a faithful judiciary to check an evil legislature they should turn to reform the legislature."

The bill of complaint does not allege the existence of an executive record that would reveal the alleged abuse of executive and legislative powers and the court will not take judicial knowledge of its existence nor receive parol evidence to establish it, which would certainly bring about the chaotic condition described by Mr. Justice Irvine in Webster v. City of Hastings, 56 Neb. 669, 77 N. W. Rep. 127.

12—Vol. 84

The proposition involved in this case "does not relate to the capacity to pronounce a law which is admitted to have been enacted, void, by reason of its unconstitutionality. That is clearly a function of judicature. But the proposition is, whether, when the legislature" (or the Governor acting in a legislative capacity) "has certified to a mere matter of fact, relating to its own conduct and within its own cognizance, the courts of the State are at liberty to inquire into or dispute the veracity of that certificate," by taking testimony of witnesses upon the subject. Pangborn et al. v. Young, 32 N. J. L. 29.

The power of the Governor to certify to the approval of a law, enacted by the legislature and presented to him for consideration, is one of the trusts of the constitution. That he has done so in this case the record shows. And unless it appears by an executive record of equal dignity that his approval was an error or mistake the law must stand so far as the first attack made upon it is concerned.

In the investigation of this question we have examined many decisions and text books and have had the aid of briefs of able counsel, but among all the decisions and text books we have not discovered a case nor a passage in any text book discussing the exact point presented here; the failure of the legislature to present a "bill" duly passed to the Governor, where under a constitution like ours a bill duly passed does not become a law until presented to the Governor.

The case of Monroe v. Green, 71 Ark. 76 S. W. Rep. 199, cited in the brief of appellee's counsel is not exactly in point because the constitution of Arkansas did not provide that every bill passed, before *becoming a law,* should be presented to the Governor, which clause in our constitution, the

majority of the court construe to mean presented by the legislature before adjournment. In which view a majority of this court agree with the view expressed by Mr. Chief Justice Bunn in his dissenting opinion in the above case.

So far as we have discovered it is the first time in the history of this Republic that officers of the legislature and the Governor have, as alleged in the bill of complaint, agreed among themselves to make an executive and legislative record of a transaction that never occurred. We do not mean to say that the books do not record a similar transaction. We have not found it. So the case seems to be *sui generis* and the cases cited in the briefs therefore are not very helpful, because not analogous.

In the Fowler-Pierce case, *supra,* which was overruled by Sherman v. Story, 30 Cal. 256, the bill was admittedly presented by the legislature, but the point was that the Governor had signed it after the adjournment of the legislature and his approval never reported to either House. It was held in that case that this was admissible to disprove the official act. To that extent the views expressed in this opinion are in line with the views expressed by the California Court speaking through Mr. Chief Justice Murray.

The signature of the Governor to the bill is the record of an executive act in which the executive acted in a legislative capacity, says this court in State v. Deal, 24 Fla. 293, 4 South. Rep. 899, and Advisory Opinion, 23 Fla. 297, 6 South. Rep. 925. That record, in so far as it relates to the Governor's power or authority to make it, is *prima facie* valid and imports verity and is unimpeachable except by an executive record of equal dignity. In announcing this doctrine we apply by analogy the Journal Entry rule, that is to say as an enrolled bill in the Secretary of State's office being the record of an official act of the legislature

may be impeached only by the legislative journals, so the record of the executive official act may be impeached only by an executive record of equal dignity.

As to the matter of judicial notice of facts *in pais* to impeach the record, it would be profitless to discuss it. There is no rule of judicial notice to fit all conditions and every situation as it arises, but there is a distinction which counsel do not make in their briefs, that is between things of which the court should take judicial notice and things of which it may take judicial notice. We are convinced that the allegations of fact in the bill of complaint do not come under the first classification and we are equally sure that they do not fall under the latter. Nor will parol evidence be received to impeach the record. State v. Smith, 44 Ohio St. 348 7 N. E. Rep. 447. Nor will the invalidity of the statute be proved by the admissions of the parties. Happel et al. v. Brethauer, 70 Ill. 167; Attorney General v. Rice, 64 Mich. 385, 31 N. W. Rep. 203.

In Stevenson v. Colgan, 91 Cal. 649, 27 Pac. Rep. 1089, 14 L. R. A. 459, Mr. Justice De Haven, speaking for the court, said: "When the right to enact a law depends upon the existence of facts, it is the duty of the legislature, before passing the bill, and of the governor before approving it, to become satisfied in some appropriate way that the facts exist, and no authority is conferred upon the courts to hear evidence, and determine, as a question of fact, whether these co-ordinate departments of the state government have properly discharged such duty."

Many cases hold that parol evidence or other extrinsic evidence is inadmissible to show that an enrolled bill was not approved by the Governor *within* the *time* limited by the constitution, nor to show disregard of a constitutional

mandate in its passage, nor to alter the recital of the journal, nor that it was not approved by the Governor at all. See State ex rel. Crenshaw et al. v. Joseph et al., *supra;* Bloomfield v. Board of Chosen Freeholders of Middlesex Co., 74 N. J. L. 261, 65 Atl. Rep. 890; People v. Clayton, 5 Utah 598, 18 Pac. Rep. 628; Capito v. Topping, 65 W. Va 587, 64 S. E. Rep. 845, 22 L. R. A. (N. S.) 1089; Gibson v. Anderson, 65 C. C. A. 277, 131 Fed. Rep. 39; Jackson v. State, 131 Ala. 21, 31 South. Rep. 380; Anderson v. The People, 33 Colo. 793, 79 Pac. Rep. 1031, 108 Am. St. Reports 76; Koehler v. Hill, 60 Iowa 543, 14 N. W. Rep. 738; Berry v. Balt. & Drum Point R. R. Co., 41 Md. 446; Auditor General v. Board of Sup'rs. of Menominee Co., 89 Mich. 552, 51 N. W. Rep. 483; Attorney General v. Rice, *supra;* Wilson v. Markley, 133 N. C. 616, 45 S. E. Rep. 1023.

As to the second point of attack upon the bill, which attacks it as an invalid exercise of legislative power. It is contended that the Act, Chapter 8411 Laws 1921, imposes an ''excise on sales tax in addition to the license tax.''

The first section of the Act is as follows: ''Section 1. Every dealer in gasoline, or other like products of petroleum under whatever name designated, used for illuminating, heating, cooking, or power purposes, in this State shall pay a license tax of Five ($5.00) Dollars for each place of business and in addition thereto one cent per gallon for every gallon of gasoline, or other like products of petroleum sold by him for the purposes aforsaid. Said license tax of Five ($5.00) Dollars shall be paid to the Comptroller who shall issue to the licensee a receipt of certificate evidencing the payment of the said fees. Said receipt or certificate shall be posted or displayed and so kept at all times open to the public view at the place of business for which the same is issued. The license tax of one cent per gallon on gasoline,

or other like products of petroleum shall be paid to the Comptroller monthly in the following manner. On or before the 5th day of each month the dealer shall report under oath to the Comptroller the number of gallons of such products sold by him during the preceding month and shall at the same time pay to the Comptroller the amount of license tax above mentioned.''

The section requires every dealer in gasoline to pay a license tax of five dollars for each place of business ''and in addition thereto one cent per gallon for every gallon of gasoline, or other like products of petroleum sold by him for the purposes aforesaid.''

Art. IX, Sect. 1 of the Constitution is as follows: ''Section 1. The Legislature shall provide for a uniform and equal rate of taxation, and shall prescribe such regulations as shall secure a just valuation of all property, both real and personal, excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious or charitable purposes.''

Article IX, Sect. 5 is as follows: ''The Legislature may also provide for levying a special capitation tax, and a tax on licenses.''

In the case of Afro-American Industrial & Benefit Ass'n of the United States v. State, 61 Fla. 85, 54 South. Rep. 393, the court held that under the above quoted sections of the constitution only two classes of taxes can be levied in this State, an advaloren tax and a tax on licenses.

It is argued that the tax imposed by the Act in question of one cent per gallon on gasoline, is neither an advalorem tax nor a tax on licenses. That neither the tax of five dollars, nor the tax of one cent per gallon on gasoline is

valid, because if it is regarded as a license tax it vitiates Section 17 of Article V of the Constitution which provides that the County Judge "shall issue all licenses required by law to be issued in the county." But the Act requires.the licenses to be issued by the Comptroller. A license tax imposed by the legislature for the use of motor vehicles on the public roads in the State and required to be paid to the "Tax Collector" of the several counties of the State does not conflict with the mandate of Section 17, Article V of the Constitution, See Jackson v. Neff, 64 Fla. 326, 60 South, Rep. 350.

In that case it was said that the tax imposed by the Act, Chapter 6212, Laws of 1911, is manifestly for the privilege of using motor driven vehicles on the public roads of the State and that it was applicable alike to all owners or operators of such vehicles. That a license tax may be imposed by the legislature for the use of such vehicles on the public roads, as it was the duty of the counties to keep the roads in good condition. Yet, the license tax imposed by that Act was required to be issued in the counties. But the license tax imposed by Chapter 8411, Acts 1921, does not require the license to be issued in the counties. Upon that ground this court has held that the clause of the constitution referred to, Section 17 of Article V, is not applicable. See Ex Parte Gilletti, 70 Fla. 442, 70 South. Rep. 446.

That the Act imposes a tax of five dollars for each place of business and one cent per gallon on gasoline sold, is not objectionable, as double taxation. Both exactions amount to one license tax. See Pullman Co. v. Knott, 70 Fla. 9, 69 South. Rep. 703; Peninsular Industrial Ins. Co. v. State, 61 Fla. 376, 55 South, Rep. 398.

The objection that the tax of one cent per gallon is an "Excise tax" and therefore not within the two classifications of advalorem and license taxes, is not sound, because an "excise" tax is one laid on licenses to pursue certain occupations, corporate privileges or sales or consumption of commodities. See Cooley's Constitutional Limitations 7 Edition 680; Flint v. Stone Tracy Co., 220 U. S. 107, 31 Sup. Ct. Rep. 342; Thomas v. United States, 192 U. S. 363, 24 Sup. Ct. Rep. 305; Nicol v. Ames, 173 U. S. 509, 19 Sup, Ct. Rep. 522; Maine v. Grand Truck Ry. Co., 142 U. S. 217, 12 Sup. Ct. Rep. 121.

An excise tax partakes of the nature of a license tax. See Pullman Co. v. Knott, *supra;* Wagner v. Covington, 251 U. S. 95, 64 L. Ed. 157, 40 Sup. Ct. Rep. 93; 17 R. C. L. 518.

A tax of one cent a gallon on sales of products within the State after they have lost their interestate character is an excise tax which is in effect a license tax; and the lawmaking power of the State may impose excise or license taxes within its discretion unless restrained by organic or paramount provisions of law.    See Peninsular Industrial Ins. Co. v. State, *supra;* Pullman Co. v. Comptroller of State of Florida, 235 U. S. 23, 35 Sup. Ct. Rep. 2; Southwestern Oil Co. v. State of Texas, 217 U. S. 114, 30 Sup. Ct. Rep. 496; Johnson v. Armour, 31 Fla. 413, 12 South. Rep. 842; Peninsular Casaulty Co. v. State, 68 Fla. 411, 67 South. Rep. 165.

Section 5 of Article IX of the State Constitution which provides that "The Legislature may provide for . . . a tax on licenses" is not a limitation upon the inherent power of the legislature to impose excise, occupational or other taxes that are in the nature of license or privilege taxes. It is an express declaration of a power that exists in the legisla-

ture. See State *ex rel.* Railroad Com'rs v. Florida East
Coast R. Co., 57 Fla. 522, 49 South. Rep. 43.

The State and Federal Constitutions and Federal laws
and treaties contain no limitation upon the power of the
State legislature to impose license taxes within its jurisdic-
tion except that due process, equal protection and contract
rights shall be observed, and interstate commerce shall not
be burdened or the exercise of Federal power interfered
with.      See Ferguson v. McDonald, 66 Fla. 494, 63 South.
Rep. 915.

The title of Chapter 8411 is an act imposing "license
taxes upon dealers in gasoline, or other like products of
petroleum; providing for reports of sales of such commodi-
ties to the Comptroller," &c.    In the body of the Act both
the one cent a gallon sales tax and the $5.00 tax for each
place of business in the State is denominated a "license
tax."    The title of the act covers "license taxes," and is
not deficient or misleading. State *ex rel.* v. Allen, decided
at this term.

As the excise tax of one cent a gallon is "in addition" to
the tax of $5.00 for each place of business in the State, it
is in the nature of a license or privilege or occupational tax
and is a part of the plural "license taxes" referred to in
the title and in the body of the Act.  Pullman Co. v. Knott,
*supra*; Peninsular Industrial Ins. Co. v. State, *supra*.

The taxes imposed by Chapter 8411 accord with due pro-
cess, do not deny equal protection of the laws or impair the
obligation of contracts or interfere with interstate com-
merce, or with the exercise of any Federal power.    The
one cent a gallon tax is by its own terms merely a tax on
only the first intrastate sale after the product "has lost its
interstate character."    It is imposed by a duly enacted

statute, applies to all alike under similar conditions, does not interfere with any contract right, and can in no way burden interstate commerce or interfere with Federal authority. The fact that none of the products is produced in the State does not make the intrastate license or excise tax discriminate against the producing States. Bowman v. Continental Oil Co., 256 U. S. 642, decided June 6, 1921; Askren v. Continental Oil Co., 252 U. S. 444, 64 L. Ed. 654, 40 Sup. Ct. Rep. 355.

It is insisted that the tax of one cent per gallon upon the gasoline or other like products of petroleum sold by the dealer is an import tax upon interstate commerce. But the language of the Act shows it to be a tax upon each gallon *sold* after it has been divested of its interstate character. It is a tax affecting internal commerce only and not analogous to those statutes involved in Western Oil Refining Co. v. Lipscomb, 244 U. S. 346, 61 L. Ed. 1181, or Crew Levick Company v. Pennsylvania, 245 U. S. 292, 62 L. Ed. 295, or Eureka Pipe Line Co. v. Hallanan, (Sup. Ct. U. S. decided December 12, 1921.

The statute does not tax a commodity shipped in bulk into this State and afterwards delivered in barrels or casks to the purchasers who bought in other States from which it came and received delivery in smaller quantities than the bulk received by the distributing agent, nor is it a tax upon the business of carrying on interstate commerce. The tax is levied upon the gasoline in the hands of any person engaged in the business of selling the commodity at wholesale in this State after it has been divested of its interstate character. "Gasoline imported by the distributor from another State but used in the conduct of its business loses its interstate character and may be sub-

jected to the excise'' tax imposed by the State. See Bowman v. Continental Oil Co., *supra.*

No arbitrary, unjust or oppressive discrimination appears even if sales for all purposes are not covered by the tax (Peninsular Industrial Ins. Co. v. State, 61 Fla. 376, 55 South. Rep. 398; Southwestern Oil Co. v. State of Texas, 217 U. S. 114, 30 Sup. Ct. Rep. 496; Hatch, People of State of New York *ex rel.* v. Reardon, 204 U. S. 152, 27 Sup. Ct. Rep. 188), and the penalties provided for are manifestly not excessive (16 C. J. 1358; East v. VanDeman & Lewis Co., 240 U. S. 342, 36 Sup. Ct. Rep. 370) ; nor is the act void for uncertainty (1 Lewis' Sutherland Stat. Const. 2nd ed. 86; Peninsular Industrial Ins. Co. v. State, 61 Fla. 376, 55 South. Rep. 398.)    The fact that the one cent a gallon sales tax increases the price paid by consumers does not render the tax invalid, even though consumers use motor boats and not the public roads, to which latter the license taxes are applied.

The fact that the $5.00 license tax for each place of business was not payable until October, 1921, while the tax of one cent per gallon on sales was made payable before October, 1921, does not affect the validity of the Act.    This was a matter of legislative discretion.    Pullman Co. v. Knott, *supra;* Pullman Co. v. Knott, 235 U. S. 23, 35 Sup. Ct. Rep. 2.

The discretionary power of the lawmaking department to impose fines to redress wrongs done, is limited only by the organic provisions requiring due process and equal protection of the laws to be observed and forbidding excessive fines to be imposed.    Fines may be excessive within the prohibitions of the constitution when they are so great or numerous as to shock the conscience of reasonable men, or

are patently and unreasonably harsh or oppressive as penalties for the wrongs sought to be redressed, or so great or numerous as to intimidate persons in asserting their rights to test the validity of laws or regulations which they may be required to observe, and thereby to deny due process and equal protection of the laws.    See *Ex Parte* Young, 209 U. S. 123, 28 Sup. Ct. Rep. 441; Florida East Coast Ry. Co. v. State, 79 Fla. 66, 83 South, Rep. 708.

There being no definitely fixed rules or standards for determining what are and what are not excessive fines, each case whether a statute prescribing fines or a judgment imposing a fine under a statute, must be adjudged on its merits (Frese v. State. 23 Fla. 267, 2 South. Rep. 1; Waters Pierce Oil Co. v. State of Texas, 212 U. S. 86. 29 Sup. Ct. Rep. 220) and the courts will not declare a statutory fine to be excessive in violation of the constitution unless it is plainly and undoubtedly in excess of any reasonable requirements for redressing the wrong.    See 16 C. J. 1358; Kincaid v. Jackson, 66 Fla. 378, 63 South. Rep. 706; Baeumel v. State, 26 Fla. 71, 7 South. Rep. 371; Weems v. United States, 217 U. S. 349, 30 Sup. Ct. Rep. 544.

In the statute here considered the penalty prescribed for a first offense in violating its provisions is as for a misdemeanor not otherwise provided for, *viz*, a fine not exceeding $200.00 or imprisonment not exceeding 90 days, or both.    Sec. 5005 Rev. Gen. Stats; And for a second or further offense a fine of not less than $500.00, nor more than $5,000.00.    This is not manifestly or clearly an excessive penalty.

The provisions of Section 2 of the Act conferring upon the Comptroller, a constitutional State officer, authority to ascertain and to enforce amounts that may become due under the statute, are obviously reasonable and appropriate

regulations to make the Act effective as in other somewhat similar cases.    Pullman Co. v. Knott, *supra.*    Even if the authority conferred by Section 6 upon the Comptroller in his discretion to revoke licenses issued by him under the Act, may be regarded as arbitrary and for that or any other reason invalid, such provisions may be eliminated without destroying the efficacy of the Act for the purposes designed.

We do not decide the question presented by the Attorney General, that the suit is in effect one against the State to enjoin the enforcement of one of its laws, nor that the complainant has not shown any peculiar injury to himself by reason of the enforcement of the law and has brought his case under no acknowledged head of equity jurisdiction.    It being unnecessary to determine those questions at the present time in view of the conclusion at which we have arrived as to the attack made on the Act.

, Concurrence of Mr. Justice Whitfield and Mr. Justice West in this opinion on the rehearing should not be considered as a modification of the views expressed by them in the dissent from the original opinion, since the language employed in this opinion on rehearing is intended to be so limited as to express the views of the writer thereof, or of the majority of the court upon the points discussed in the first opinion.

From what has been said it follows that the order appealed from should be reversed.    It is so ordered and the cause remanded with directions to dismiss the bill, unless the complainant amends his bill within fifteen days after the receipt by the clerk of the circuit court of the mandate.

WHITFIELD AND WEST, J. J., concur.

BROWNE, C. J., AND TAYLOR, J., *concur* in part and dissent in part.

WHITFIELD, J., Concurring.

In legislative procedure an enrolled bill is a typewritten copy ''in black record ink'' ''on paper,'' of the bill that had been ''passed by the Senate and House of Representatives.'' See Sec. 82, Rev. Gen. Stats. 1920.

In this case the enrolled bill is in the office of the Secretary of State, who by the constitution ''shall keep the records of official acts of the legislative and executive departments of the government,'' and who, by Section 88 Rev. Gen. Stats. ''Shall have the custody and care of the original statutes of the State.'' The enrolled bill is regular on its face, it is authenticated by the signatures of all the legislative officers who are by the constitution and legislative rules required to sign, it, and it is approved and signed by the Governor. It is published, under Section 19, Art. III of the Constitution and Sec. 103 Rev. Gen. Stats., as Chapter 8411, with the other laws enacted in 1921.    Being in the office of the Secretary of State, and being regular on its face and authenticated and approved and signed as stated, and having been published as a law as required by the constitution and the statute, the enrolled bill is necessarily a ''record of official acts of the legislative and executive departments'' in the proper custody, even though its validity as a statute may be impeached by due course of law.    As such record of official acts of the legislature and executive departments, the enrolled bill imports verity and is *prima facie* valid.    The *prima facie* validity of its enactment may be overcome by sufficient competent evidence in appropriate proceedings as controlling law may provide; but until it is duly adjudged to be invalid, the enrolled bill is a *prima*

*facie* valid record of acts of the legislative and executive departments, and should be so regarded according to its import.    The allegations of the bill of complaint show the existence of the enrolled bill as a "record of official acts of the legislative and executive departments.".

If, as is alleged, the enrolled bill was not signed by the legislative officers or presented to the Governor at the time and in the manner required by the constitution, it does not so appear by the enrolled bill or by any public record that has been brought to the attention of the court, and such matters do not go to the existence of the enrolled bill as a record of official acts of the legislative and executive departments, but it is asserted they go to the validity of the enactment of the enrolled bill as a law.

Therefore the real question is, not whether the enrolled bill is a "record of official acts of the legislative and executive departments," but whether the alleged invalidity of the enactment of the enrolled bill may be shown by the matters resting in parol that are alleged in the bill of complaint.

In some jurisdictions the validity of the enactment of a law as shown by an enrolled bill authenticated and approved that is regular on its face and is in the proper custody, cannot be impeached even by the legislative journals. See Field v. Clark, 143 U. S. 649, 12 Sup. Ct. Rep. 495; 162 U S. 547; State *ex rel.* Hammond v. Lynch, 169 Iowa 148 151 N. W. Rep. 81; State *ex rel.* George v. Swift, 10 Nev. 176; State ex rel. Coffin v. Howell, 26 Nev. 93, 64 Pac. Rep. 466; 25 R. C. L. 895; Western Union Tel. Co. v. Taggart, 141 Ind. 281, 40 N. E. Rep. 1051; 60 L. R. A. 671. In this State an enrolled bill that is on file in the office of the Secretary of State and is authenticated by the signa-

tures of the legislative officers who are by the constitution required to sign it, and is approved and signed by the Governor, can be shown not to have been duly enacted as a law, only by an affirmative showing of the legislative journals that the bill was not duly passed. State *ex rel.* Boyd v. Deal, 24 Fla. 293, 4 South. Rep. 899; Wade v. Atlantic Lumber Co., 51 Fla. 628, 41 South. Rep. 72) or by a failure of the legislative journals to show that the bill was duly passed by the required yea and nay vote in each house of the legislature. See State *ex rel.* Turner v. Hocker 36 Fla. 358, 18 South. Rep. 767; State *ex rel.* Markens v. Brown, 20 Fla. 407; State *ex rel.* Attorney General v. Green, 36 Fla. 154, 18 South. Rep. 334; Mathis v. State, 31 Fla. 291, 12 South. Rep. 681; Amos v. Mosley, 74 Fla. 555, 77 South. Rep. 619; State *ex rel.* Cheyney v. Sammons, 62 Fla. 303, 57 South. Rep. 196; West v. State, 50 Fla. 154, 39 South. Rep. 412. In the absence of fraud, and perhaps of accident or mistake of fact, an enrolled bill in the proper custody that is shown by the legislative journals to have been duly passed by the legislature and is regular on its face and signed by all the officers who are required by the constitution to sign it, and is approved and signed by the Governor, imports verity. "As all bills and joint resolutions that pass both Houses of the legislature are required to be signed by their respective presiding officers, and also by the Secretary of the Senate and Clerk of the House of Representatives, an Act thus authenticated and approved by the Governor will not be set aside unless the journals affirmatively and explicitly show that the constitutional requirements have not been observed, except where the constitution requires the journals to show the action taken, and then their silence will be fatal." State *ex rel.* Attorney General v. Green, *supra.*

"Acts of the legislature duly enrolled and signed by the officers of the two houses and filed in the office of the Secretary of State with the approval of the Governor thereon, are *prima facie* valid and authoritative laws, but the journals of the two houses that enacted them may be resorted to to ascertain whether the mandatory requirements of the constitution have been complied with by the legislature in their enactment, and if such journals show explicitly, clearly and affirmatively that any essential constitutional requirement has not been complied with, or if they fail to show any essential step in the process of enactment that the constitution expressly requires them to show, such, for example, as the entry of the ayes and noes upon the final passage of any bill in either house, then such journals would prevail as evidence, and the enrolled bill, as evidence of the law, would have to fall." State *ex rel.* Turner v. Hocker, *supra.* See Stockton v. Powell, 29 Fla. 1, 10 South. Rep. 689; State *ex rel.* Markham v. Brown, *supra.*

The enrolled bill constituting Chapter 8411, Acts of 1921, is shown by the legislative journals to have been duly passed by both houses. It is regular on its face, it is signed by all of the legislative officers who are required by the constitution or by the legislative rules to sign it, it is approved and signed by the Governor as provided by the constitution and it was duly filed in the office of the Secretary of State. It is a law. See United States v. Ballin, 144 U. S. 1, text 9, 12 Sup. Ct. Rep. 507; White v. Hinton, 3 Wyo. 753, 30 Pac. Rep. 953; Comm'rs Leavenworth Co. v. Higginbotham, 17 Kan. 62. No fraud, accident or mistake is alleged. The Act should not be annulled by the courts upon the allegations of the bill of complaint that rest in parol. 59 Neb. 106; 56 Neb. 260; 162

U. S. 547; 77 Ill. 11; 30 Cal. 263; 64 N. C. 244; 29 Fla. 1; 130 Ala. 169, 30 South. Rep. 494.

"The records of official acts of the legislative and executive departments of the government," are required to be kept by the Secretary of State. Sec. 21, Art. IV Const. The rule is that when such records are regular on their face and are in the proper custody, they import verity to the judicial department. See Leser v. Garnett, Sup. Ct. of U. S., decided February 27, 1922; 162 U. S. 547; 22 L. R. A. (N. S.) 1089. The validity of such records can be impeached by the judicial department only by virtue of a controlling record or law that the courts under the constitution must make effective. This rule is essential to orderly government under the constitution dividing the powers of government into three separte, coordinate departments, each department being independent of the others and each being excluded from the domain of the others, and from interfering with the acts and procedure of the others, except as the constitution otherwise provides or authorizes.

The fact that the signing of the bill by the legislative officers and its presentation to the Governor is alleged to have occurred after the legislature adjourned and therefore could not be noted in the journals, does not effect the rule which imports verity to the enrolled bill that is authenticated and signed upon the official responsibility of the officers, no organic provision appearing to have been violated. The signing and presenting of the bill are not required by the constitution to be done before adjournment of the legislature or to be noted in the journals. The enrolled bill being regular on its face and signed by all the officers who are required to sign it to authenticate it as an enacted statute, and the bill having been approved

and signed by the Governor, it is presumed to be what it purports to be until it is duly adjudicated to be invalid by virtue of its conflict with superior law. This presumption is fortified by the commands of the constitution that "all bills" passed by the legislature "shall be signed" by the stated legislative officers, and that "every bill" passed by the legislature "shall, before becoming a law, be presented to the Governor," the time and manner of such signing and presentation not being stated in the constitution except that the bill "shall, before becoming a law, be presented to the Governor." It is alleged that the Governor received the bill six days before he approved and signed it to make it a law under the constitution.

If the legislative journals should show that the legislative officers were directed to enroll, authenticate and sign the bill after adjournment and then present it to the Governor for his official action on it, the duly passed bill would not have been invalidated and the constitution would not have been violated by such enrolling, signing and presentation after adjournment in view of the commands of the constitution that "all bills" duly passed by the legislature "shall be signed" by the stated legislative officers and that "every bill that may have passed the legislature shall, before becoming a law, be presented to the Governor," and that when a duly passed bill has been presented to and approved and signed by the Governor, it "shall be a law," there being no provision in the constitution that the bill shall be signed by the legislative officers and presented to the Governor before the final adjournment of the legislature or that such signing and presentation shall be noted in the journals or that such signing by the legislative officers is essential to the effective validity of the enacted bill as a law, the signing by the legislative officers being not

a part of the passage of the bill, but being the controlling
method prescribed by the constitution for identifying and
authenticating the bill as one that had been duly passed
by the legislature as shown by the journals. The re-
quired signing of the bill for identification and authentica-
tion may be effectively done on official responsibility after
adjournment to comply with the command that "all bills"
that are duly passed "shall be signed" by the legislative
officers, since the constitutional command to sign *all* duly
passed bills is not qualified by a limitation as to the time
or manner or place of such signing, and the courts have
no power to add such a limitation to the constitution.
The duty of the stated legislative officers to sign all duly
passed bills is made absolute by the constitution and such
duty continues until properly performed to authenticate
the bill to the Governor in due time for his official action
thereon within the time fixed by the constitution for the
Governor to disapprove the bill to prevent it from becom-
ing a law according to its provisions. If before the ex-
piration of ten days after the final adjournment of the
legislature, the Governor had filed the bill in the office of
the Secretary of State with his objections to it, the bill
would not be law. But the Governor approved and signed
the bill, thereby accepting the authentication and presen-
tation of the bill as being both lawful as to the time it was
done, and as being satisfactory to him with reference to
his privilege to have ten days after the final adjournment
of the legislature in which to consider the bill. He ap-
proved and signed the bill before the expiration of his
time limit, thereby waiving his privilege, and he is not
complaining.

Where a legislative bill regular on its face has been
signed by the legislative officers who are by the constitution

mandatorily required to sign "all bills" passed by the legislature, and the bill is approved and signed by the Governor and by him filed in the office of the Secretary of State within the time fixed by the constitution for the Governor to approve or disapprove it, such a bill is a "record of official acts of the legislative and executive departments of the government," *i. e,.* a law that imports verity to the courts; and in the absence of fraud duly shown, the courts have no power to annul the record or the law unless it is shown by the legislative journals that the constitution was not obeyed in passisg the bill or unless the contents of the bill do not accord with applicable provisions of the constitution that the courts must enforce. Any other rule would make the official acts of the legislative and executive departments of the government in enacting, authenticating and approving a law, rest in parol and not in official records that the constitution requires to be made of such official acts. See 77 Ohio St, 182, 82 N. E. Rep. 1072, 122 Am. St. Rep. 498.

The legislative journals show conclusively that the bill here considered was duly passed by the legislature; and in approving and signing the bill within the time limited by the constitution, the Governor indicated that he regarded the bill as having been duly authenticated and presented to him as a legislative bill for his official consideration. The record of the Governor's official act in approving and signing the bill imports verity to the courts, and its validity cannot be impeached on the allegation of the bill of complaint that rests in parol. These points were reserved in the former dissenting opinion.

Even if the allegations that the bill here considered was signed by the legislative officers and presented to the Governor the day after the final adjournment of the leg-

islature may be enquired into by the courts and may be admitted or proven by the parties on the pleadings in this case, such matters do not render the Act invalid, when the legislative journals show that the bill was duly passed by the legislature, and the Act shows it was duly approved by the Governor as required by the constitution.

The constitution of Arkansas provides that: "Every bill which shall have passed both houses of the general assembly shall be presented to the Governor; if he approve it, he shall sign it; but if he shall not approve it, he shall return it, with his objections, to the house in which it originated    *    *   . If any bill shall not be returned by the Governor within five days, Sundays excepted, after it shall have been presented to him, the same shall be a law in like manner as if he had signed it; unless the general assembly by their adjournment, prevent its return; in which case it shall become a law, unless he shall file the same, with his objections, in the office of the Secretary of State, and give notice, by public proclamation, within twenty days after such adjournment."

In Monroe v. Green, 71 Ark. 527, 76 S. W. Rep. 199, the legislature adjourned April 30, 1903. On May 15th a bill that had been enrolled on May 12th was received by direction of the Governor from the Clerk of the House, but as it was not signed by the presiding officers of the legislature it was returned the next day. On May 23 the bill signed by the presiding officers of the legislature was presented to the Governor who on the same day vetoed the bill on the ground that it was not presented to him in time. On the first presentation the bill was not authenticated to the satisfaction of the Governor and he returned it. When it was again presented to the Governor on May 23rd, the twenty days after adjournment of the legislature on

April 30th limited by the constitution for the Governor's action on the bill had expired and there had been no presentation of the bill duly authenticated within the time for executive action on the bill; it was vetoed by the Governor on the ground that it was not presented to him in time, and the court held that as the bill was not presented to the Governor within the time limited by the constitution for the Governor to act on the bill, it did not become a law. This holding was proper for the reason that as there had been no presentation to the Governor of an authenticated bill until after twenty days from the adjournment of the legislature the bill could not under the constitution become a law even if it had been approved and signed by the Governor after its presentation to him, the time within which the Governor could legally or effectively either approve or disapprove the bill as expressly limited by the constitution having expired before an authenticated bill was presented to him.

In this case the Governor received the bill more than a week before the expiration of the time for executive consideration of the bill. If the Governor had duly vetoed the bill within ten days after adjournment on the ground that it had not been presented to him in time for his satisfactory consideration before the expiration of his constitutional time limit, the bill would not have become a law; but the Governor duly approved and signed the bill before the expiration of the constitutional time limit, and in doing so he waived his privilege as to full time for executive consideration as allowed him by the constitution. See Dow v. Beidelman, 49 Ark. 325, 5 S. W. Rep. 297; Monroe v. Green, 71 Ark. 527, text 534, 76 S. W. Rep. 199; 65 L. R. A. 71; 13 Ann. Cas. 220.

In Illinois the constitution provides: "Every bill having passed both houses, shall be signed by the speakers

thereof.'' ''Every bill passed by the general assembly shall, before it becomes a law, be presented to the Governor.'' ''Any bill which shall not be returned by the Governor within ten days (Sundays excepted) after it shall have been presented to him, shall become a law in like manner as if he had signed it, unless the general assembly shall by their adjournment prevent its return, in which case it shall be filed with his objections in the office of the Secretary of State, within ten days after such adjournment, or become a law.'' The legislature of Illinois duly passed a bill before its final adjournment on June 4, 1897. The bill was enrolled on June 10, 1897, and ''was thereafter, before June 15, 1897, duly signed by W. A. Northcutt, President of the Senate, and Ed. C. Curtis, Speaker of the House of Representatives;'' and ''thereafter on the 15th day of June, 1897, the said bill was presented to the Governor for his approval.'' The Governor returned the bill to the office of the Secretary of State ''without signature or approval, and without filing objections thereto or vetoing the same.'' On June 16, 1897, the Supreme Court of Illinois held that the Governor had ten days, exclusive of Sundays, after the legislature adjourned in which to veto the bill, which extended to midnight of June 16, 1897, and ordered that unless the Governor vetoed the bill before the expiration of ten days after the adjournment, exclusive of Sundays, which would be midnight of the day on which the order was made, the court would at the instance of the Attorney General issue a writ of mandamus requiring the Secretary of State to ''include it in the list of session laws of the Fortieth General Assembly now being prepared by said Secretary for publication.''

The quoted provisions of the Illinois constitution are similar to those in the Florida constitution and the decis-

ion is an express adjudication of the validity as an Act of a bill that was enrolled and signed by the legislative officers at least six days after final adjournment of the legislature, and that was not presented to the Governor until nine days, excluding Sundays, after the legislature adjourned, which was the day before the last day the Governor had in which to veto the bill.

A signing of the bill by the legislative officers is in Illinois held to be mandatory, Burritt v. Commissioners of State Contracts, 120 Ill. 322, 11 N. W. Rep. 180; Lynch v. Hutchinson, 219 Ill. 193, 76 N. E. Rep. 370; but signing after adjournment and before presentation to the Governor was sufficient in People *ex rel.* Akin v. Rose, 167 Ill. 147, 47 N. E. Rep. 547.

In some States the constitutions require enacted bills to be signed by the legislative officers in open session of the legislature (George Bolln Co. v. North Platte Valley Irrigation Co., 19 Wyo. 542, 121 Pac. Rep. 22, 39 L. R. A. (N. S.) 868; State *ex rel.* McClay v. Mickey, 73 Neb. 281, 102 N. W. Rep. 679), and some constitutions also require such signing to be noted in the journals. Hadley v. State, 22 Tex. App. 396, 3 S. W. Rep. 233; 36 Colo. 65; 118 Tenn. 1. Some constitutions expressly provide that bills passed by the legislature shall not become laws until signed by the legislative officers in open session. State *ex rel.* Attorney General v. Mead. 71 Mo. 266; Hammett v. McCreary, 153 Ky. 755, 156 S. W. Rep. 410. See also Nelson v. Haywood County, 91 Tenn. 596, text 599, 20 S. W. Rep. 1.

Even in some of these States a failure of the legislative journals to show such signing in open session does not affect the validity of the enactment. *In re* Roberts, 5 Colo. 525;

State *ex rel.* Attorney General v. Mead, *supra;* Home
Tel. Co. v. City of Nashville, 118 Tenn. 1, 101 S. W. Rep.
770, 11 Ann. Cas. 824; Adams v. Clark, 36 Colo. 65, 85
Pac. Rep. 642. In some States the failure of one presid-
ing officer to sign a bill does not affect its validity as
law. Cottrell v. State, 9 Neb. 125, 1 N. W. Rep. 1008;
Taylor v. Wilson, 17 Neb. 88, 22 N. W. Rep. 119; State
*ex rel.* Nebraska State Ry. Commission v. Missouri Pac.
R. Co., 100 Neb. 700, 161 N. W. Rep. 270; Commissioners of
Leavenworth Co. v. Higginbotham, 17 Kan. 62; Douglas
v. Bank of Missouri, 1 Mo. 20. But the failure of both
presiding officers to sign a bill is held to be fatal where
the signing is required to be done in open session. State
*ex rel.* McClay v. Mickey, *supra.*

In Kansas, where the constitution provides that, ''Every
bill and joint resolution passed by the house of represen-
tatives and senate shall within two days thereafter, be
signed by the presiding officers, and presented to the Gov-
ernor,'' it was expressly held that ''a failure of the pre-
siding officers to sign a bill within two days after its pas-
sage does not defeat the act, nor in any manner impair
its validity, if it be thereafter duly authenticated and ap-
proved by the Governor.'' Aiken v. Edwards, 55 Kan. 751,
42 Pac. Rep. 366. See also 162 U. S. 547; 30 Pac. Rep.
953; 17 Kan. 62; 100 Neb. 700.

The enrolled bill in this case is signed by all the officers
who are by law or rules required to sign it. It has been
approved and signed by the Governor.

In this State the constitution mandatorily provides that
''all bills so passed shall be signed by the presiding officer
of the respective houses and by the Secretary of the Sen-
ate and the Clerk of the House of Representatives,'' but
the constitution does not require such signing to be in open

session or before adjournment, or that the signing shall be noted in the journals. In States having organic provisions similar to ours, legislative enactments are signed by the legislative officers after final adjournment of the legislature. See People *ex rel.* Akin v. Rose, 167 Ill. 147, 47 N. E. Rep. 547. See also Dow v. Beidelman, 49 Ark: 325, 5 S. W. Rep. 297; Houston & Texas Cent. R. Co. v. Odum, 53 Tex. 343; Lankford v. County Com'rs of Somerset County, 73 Md. 105, 22 Atl. Rep. 412; 11 L. R. A. 491; 71 Ark. 527.

Signing bills by the legislative officers is not a part of the passage of the bills but is for purposes of identification and authentication. See State *ex rel.* Attorney General v. Green, 36 Fla. 154, text 173, 18 South. Rep. 334; Lewis' Sutherland Stat. Construction (2nd Ed.) Sec. 56; 55 Kan. 751.

The constitution contemplates the passage of bills up to the time of final adjournment of the legislature, and it does not require bills that are passed to be authenticated by the signing of such bills by the legislative officers before adjournment, or that such bills shall be presented to the Governor before adjournment of the legislature. This has been expressly held in States where the constitutional provisions are similar to those in Florida. See Dow v. Beidelman, 49 Ark. 325, 5 S. W. Rep. 297; Lankford v. County Com'rs of Somerset County, 73 Md. 105, 22 Atl. Rep. 412, 11 L. R. A. 491; People *ex rel.* Akin v. Rose, 167 Ill. 147, 47 N. E. Rep. 547; Monroe v. Green, 71 Ark. 527.

Chapter 7346 Laws of Florida provides for enrolling bills after their passage and "before they shall be presented to the Governor." To do this requires time, and where there are a great many bills passed just in the

closing hours of the session, more time would likely be required than would be allowed, if all bills were required to be actually presented to the Governor before the adjournment of the session. Lankford v. County Com'rs of Somerset County, 73 Md. 105, text 112, 22 Atl. Rep. 412, 11 L. R. A. 491.

In Dow v. Beidelman, 49 Ark. 325, text 334, 5 S. W. Rep. 297, it is held that nothing in the State constitution "implies that all bills must be transmitted to the Governor before the adjournment of the Assembly. · He is prevented by the adjournment from returning the bill, whether the bill is in his hands before it adjourns or reaches his hands afterwards. The term of members does not expire when it adjourns, nor do all the functions and powers of its officers then cease. It may often happen, in the case of bills passed in the closing hours of a session, that there is not sufficient time to enroll them properly and present them to the executive, before an adjournment takes place. The effect is not that, under the circumstances, the bill fails to become a law. Our constitutional provision differs materially in this respect from Section 7 of Article 1 of the constitution of the United States."

The constitution provides that "The vote on the final passage of every bill or joint resolution shall be taken by yeas and nays, to be entered on the journals of each house. * * * A majority of the members present in each house shall be necessary to pass every bill or joint resolution. All bills or joint resolutions so passed shall be signed by the presiding officer of the respective houses and by the Secretary of the Senate and the Clerk of the House of Representatives." The courts have no power to add to the constitution a provision that the signing of bills by the legislative officers shall be "in open session," or "before final adjournment." The signing of the bill in

this case by the officers "of the respective houses" complied with the constitution and satisfied the Governor, who approved and signed the bill as authenticated and presented to him. The signing is by the constitution required to be done by the legislative officers "of the respective houses," not by the legislative officers *in* the respective houses.

The President of the Senate is the presiding officer of the Senate, and the Speaker of the House is the presiding officer of the House. They continue as such until their terms expire or their successors are elected, even though the legislature is in adjournment. See Sec. 6, Art. III; Sec. 19, Art. IV Constitution. The legislature by Acts and Resolutions provide duties and compensation for the Secretary of the Senate and Clerk of the House of Representatives after adjournment of the legislature. Sec. 94 Rev. Gen. Stats. 1920; Sec. 2 Chap. 8408 Acts 1921; Senate Con. Res. 29, p. 461, Acts 1921.

The legislative rules do not forbid the signing by the legislative officers after adjournment of bills that have duly passed both houses; and even if the rules did so forbid, they would be inoperative because in conflict with the express command of the constitution that "all bills so passed shall be signed by the presiding officer of the respective houses," etc., without limitation as to the time and place of such signing, the signing being not a part of the passage of bills, but the prescribed means of authenticating all bills that are duly passed as shown by the legislative journals. The mandatory duty of the stated legislative officers to sign *"all bills"* that have been duly passed continues until such duty is properly performed by the due authentication of *all* duly passed bills in time to afford the Governor an opportunity to exercise his au-

thority to approve or to veto the bills as provided by the constitution.

The constitution also provides that "Every bill that may have passed the legislature shall, before becoming a law, be presented to the Governor." The courts have no power to add to the constitution a provision that such bills shall be presented to the Governor "by the legislature while in session." In this case the bill "before becoming a law" was "presented to the Governor," to his satisfaction, for he approved and signed it, thereby making it a law on June 10, 1921, the bill having duly passed the legislature. The constitution expressly provides that the Governor shall have ten days after final adjournment of the legislature to act upon bills where because of the adjournment the Governor is prevented from returning the bill to the legislature "within five days after it shall have been presented to" him. Additions can be made to the constitution only as provided in its Article XVII. See Crawford v. Gilchrist, 64 Fla. 41.

The constitution provides that when a bill has been duly passed by the legislature and duly approved and signed by the Governor, it shall be a law; and, no fraud being involved, when an Act is so passed and approved and signed and placed in the proper custody, the courts have no power to nullify the Act on the ground that it was enrolled and signed by the legislative officers and presented to the Governor the day after the adjournment of the legislature, when the constitution does not require duly passed bills to be signed by the legislative officers in open session or before final adjournment, and does not make such signing in open session a prerequisite to the effectiveness of the Act and does not require such bills to be presented to the Governor before adjournment; but the con-

stitution merely requires such a bill so passed to be signed by the legislative officers who continue in office after adjournment, and merely requires the bill to be presented to the Governor before it becomes a law, the Governor having ten days after adjournment to approve or veto the bill, and the constitution providing that when a bill has been passed by the legislature and approved and signed by the Governor, it shall be a law. See People *ex rel.* Akin v. Rose, *supra;* Dow v. Beidelman, 49 Ark. 325, 5 S. W. Rep. 297; Lankford v. County Com'rs of Somerset County, 73 Md. 105, 22 Atl. Rep. 412.

The Governor approved and signed the bill before the expiration of ten days allowed him after the adjournment of the legislature, thereby waiving the latter part of the time limited; and by considering and approving the bill he likewise waived the first part of the time allowed him, if the bill was not presented to him until one day after the adjournment of the legislature. See Hunt v. State, 72 Ark. 241, 79 S. W. Rep. 769, 65 L. R. A. 71, 105 Am. St. Rep. 34, 2 Ann. Cas. 33; Dow v. Beidelman, 49 Ark. 325; 13 Ann Cas. 220.

In Hunt v. State, 22 Tex. App. 396, 3 S. W. Rep. 233, the only case cited in the first main opinion, the constitution provided that ''The presiding officer of each house shall, in the presence of the house over which he presides, sign all bills and joint resolutions passed by the legislature, after their titles have been publicly read before signing shall be entered on the journals.'' The fact of the signing of the bill in that cese by the presiding officer of the Senate was not entered upon the journals of the Senate, and the Act was for that reason held to be invalid. The contrary was held in Home Tel. Co. v. City of Nashville, 118 Tenn. 1, 101 S. W. Rep. 770, 11 Ann. Cas. 814; State *ex rel.* Attorney General v. Mead, 71 Md. 266; Adams v.

Clark, 36 Colo. 65, 85 Pac. Rep. 642; *In re* Roberts, 5 Colo. 525.

The Hunt case cited above is not authority for declaring this Act to be invalid. See People *ex rel.* Akin v. Rose, 167 Ill. 147, 47 N. E. Rep. 547, where a bill was enrolled and signed and presented to the Governor after the final adjournment of the legislature, under organic provisions as to the signing of bills by the legislative officers and as to the presentation of bills to the Governor that are similar to those in this State. In Iowa a duly authenticated enrolled bill proves itself, and as a bill was not signed by the Speaker it was held to be inoperative. 169 Iowa 148, 151 N. W. Rep. 81. But see 100 Neb. 700; 17 Kan. 62; 55 Kan. 751.

In this case the bill is signed by all the officers who are by the constitution or the legislative rules required to sign it, and it was duly authenticated by the Governor. It is in all respects regular on its face. No fraud or misconduct of any kind is suggested. The Governor and the legislative officers obeyed the constitution as it is written. The Florida constitution does not require the legislative officers to sign bills in open session, or before the adjournment of the legislature, or that the bills shall be presented to the Governor before final adjournment of the legislature. The courts have no power to add such a requirement. See 104 Ark. 583; 117 S. W. Rep. 544; 81 N. J. L. 613, Ann Cas. 1912D 329; 12 C. J. 704; 154 N. W. Rep. 1087, L. R. A. 1917D 15, 26; 89 Ark. 513; 176 Ind. 166; Cooley's Const. Lim. (7th Ed.) p. 89; 117 U. S. 567, 579; 142 Wis. 320, 20 Ann. Cas. 633. The constitution merely provides that "*all bills*" that are duly passed "*shall be signed*" by the designated legislative officers. This is a mandatory duty; and as the time and manner of its performance are not prescribed by the constitution, the duty continues until

properly performed. The constitution also provides that when a bill has been passed by the legislature and approved and signed by the Governor it shall be a law.

The Florida constitution does not make the signing of a bill by the legislative officers in open session a prerequisite to the validity of the bill as a law, as do the constitutions of Tennessee, Missouri, Kentucky, and perhaps North Carolina. The intent of a constitution is shown by the words that are used therein. The courts have no power to add provisions to the constitution.

It being shown by the legislative journals that the bill here considered was duly passed by the House May 28, 1921, and by the Senate June 2, 1921, in the manner required by the constitution, and that the legislature adjourned *sine die* June 3rd, 1921, and it appearing by the enrolled bill that all of the legislative officers whose duty it was to do so have signed the bill pursuant to the mandatory requirement of the constitution that "all bills" passed by the legislature "*shall be signed*" by them, and the Governor having approved and signed the bill on June 10, 1921, as provided by the constitution, and filed it in the office of the Secretary of State, the courts have no power to nullify the law that was duly passed by the legislature and approved by the Governor, the two constituting the legislative and executive departments of the government, upon the allegations of matters that rest in parol, or by applying limitations upon the authority and duty of the officers of such departments, when such limitations are not contained in the constitution. No authority is shown for doing so.

As is clearly shown by the discussion in the main opinion, the contents of the enrolled bill do not violate organic law as alleged.

13—Vol. 84.

Upon an inspection of the enrolled bill and a considera-
tion of the controlling provisions of the State and Federal
Constitutions, it appears that the several assertions of
invalidity of the enrolled bill as a statute, predicated upon
the allegations as to both the enactment and the contents
of the enrolled bill, are not sustained as matters of plead-
ing and of law; therefore, the demurrer to the bill of com-
plaint was well taken.

WEST, J., concurs.

BROWN, C. J., concurring in part and dissenting in part.

I concur in so much of the opinion in this case as holds
that the constitution requires all bills to be signed by the
presiding officers of the two houses and the Secretary of
the Senate and the Clerk of the House of Representatives
during the legislative session; that such bills when so
signed must be presented to the Governor by the legislature
before adjournment; that this, like all other provisions of
the constitution, is mandatory, and that bills signed by the
presiding officers of the respective houses and by the
Secretary of the Senate and the Clerk of the House of Rep-
resentatives, or that are presented to the Governor, after
the adjournment of the legislature, have not been enacted
in accordance with the essential requirements of the con-
stitution, and are invalid, inoperative and void.

I concur also in that part of the opinion that holds that
the subject-matter of House Bill No. 702, published as
Chapter 8411, Laws of Florida, Acts of 1921, comes within
the legislative power, and is not in conflict with the con-
stitution of the State of Florida, or of United States, upon
any of the grounds of attack made in the bill of com-
plaint.

I dissent, however, from that part of the opinion that holds that when the presiding officers of the Senate and House of Representatives and the Secretary of the Senate and the Clerk of the House of Representatives sign a bill after the legislature adjourns *sine die,* in violation of constitutional mandates, and the bill is delivered to the Governor after such adjournment of the legislature and filed in the office of the Secretary of State, that the testimony of the President and Secretary of the Senate, and the Speaker and Chief Clerk of the House of Representatives cannot be introduced for the purpose of proving the date when the bill was signed and when it was delivered to the Governor.

This court is advised by a sworn bill of complaint that House Bill No. 702 was signed by the presiding officers of the respectives houses of the legislature, and the Secretary of the Senate and the Clerk of the House of Representatives after the legislature had adjourned *sine die.*

Whatever impression may have prevailed as to the right of these officers to sign a bill after adjournment of the legislature, the main opinion in this case concurred in by the majority of the court, is that they had no authority to sign a bill after adjournment of the legislature *sine die;* and that is re-affirmed by this decision on this rehearing.

Mr. Justice Ellis in his opinion on the petition for rehearing emphasized it in this language: "It seems to the writer that to hold these provisions of the organic law to be directory, that the signing of the bills passed may be done after the legislature has adjourned *sine die* and cannot reassemble except upon call by the Governor under the constitutional provisions for calling extraordinary sessions, that after such adjournment the bill may be enrolled and the signatures of the officers written upon a blank

sheet of paper which is afterwards used as a cover for the so- called enrolled bill, is to trifle with language, make a sport of the greatest powers committed by the people to their representatives in legislature assembled, to ignore the solemn mandates of organic law, and open wide the door to fraud which designing persons may desire to perpetrate upon the people in the name of legislation. What becomes of the legislative attestation, in such case, that the bill so signed is the one that passed the legislative body, which the Supreme Court of the United States deemed so essential to orderly and exact legislative procedure?''

It being the law of this case, that an act of the legislature that has otherwise regularly passed the two houses, but to which the signatures of the Clerk of the House of Representatives and the Secretary of the Senate, and the presiding officers of these two bodies were not affixed until after the legislature adjourned *sine die*, is not a law, is inoperative and void, the question presents itself, is there any way in which this court can enforce the mandates of the constitution in these respects, or is this court powerless to remedy the wrong? The decision of this court is that it is powerless; and it bases its conclusion upon a mere rule of evidence. From this, I dissent.

This raises the question, is it more important to preserve rules of evidence in all their rigidity, than to enforce and require the observance of constitutional mandates?

The doctrine of this case is that when the presiding officers of the Senate and House of Representatives and the Secretary of the Senate and the Clerk of the House of Representatives, contrary to constitutional mandates, sign a bill after the adjournment of the legislature, and the bill is subsequently signed by the Governor and filed in the office of the Secretary of State, that the rules of evi-

dence prevent the truth from being established by the testimony of these officers themselves. In other words, that these persons having signed a bill and it being essential to its validity as a law that the court ascertain on what day they signed it, they cannot be called upon to establish that fact.

Rules of evidence, except in the few instances of statutory regulation, originate in—are created by—the courts, and by them have been modified, extended, restricted and enlarged from time to time as the exigencies of justice and the ascertainment of truth require. Their sole purpose is to elicit and establish truth. "But to exclude relevant evidence by any positive and arbitrary rule must be not only absurd in a scientific view, but what is worse, frequently productive of absolute injustice. It may safely be laid down that the less the process of inquiry is fettered by rules and restraints, founded on supposed considerations of policy and convenience, the more certain and efficacious will it be in its operation. Formerly the very means devised for the discovery of truth and advancement of justice were not unfrequently perverted to the purposes of injustice, and made the instruments of the most grievous and cruel oppression." 10 R. C. L. 861.

Writers on evidence furnish abundant instances where strict rules of evidence have been modified or exceptions made to them by the courts in searching for the truth. Here are but a few: "Generally speaking, the existence of a fact cannot be proved by reputation or notoriety. But on inquiring into the truth of facts which happened a long time ago, the courts *have varied from the strict rules of evidence* applicable to facts of the same description happening in modern times, because of the *difficulty* or *impossibility*, by lapse of time, of *proving those facts in the ordinary way*, by living witnesses." 10 R. C. L. 961.

"According to the early rule traditionary evidence may be admissible in relation to the boundaries of parishes, manors, and the like, which are of public interest, and generally of remote antiquity, but it is inadmissible for the purpose of proving the boundary of a private estate when not identical with one of a public nature. Many courts, however, now hold that traditional evidence is admissible to prove private boundaries." Ibid. 963.

*"Such evidence is admitted because it is the best the nature of the case admits;* and because *greater evils are apprehended from the rejection of such evidence than from its admission, the law has relaxed the general rules,* and allowed the exception." Ibid. 963.

"The courts recognize the difficulty of laying down upon this subject a rule that may be applied to every case. The tendency of recent adjudications *is to extend rather than to narrow* the scope of the introduction of evidence as the res gestae." Ibid. 975.

These are but a few instances where courts have modified and made exception to rules of evidence in order to *arrive at the truth* and do justice; but in none of them was the necessity for arriving at the truth, of such transcendent importance as in the instant case.

In the case of Blackwell v. State, 79 Fla. 709, 86 Sonth. Rep. 224, the majority of this court sanctioned the practice of enlarging rules of evidence to meet new conditions, and said: "In the earlier days the testimony of a witness given at a former trial was confined to cases where the witness was dead, or had become insane, or beyond the seas or the jurisdiction of the court; *but the tendency of the modern decisions has been to enlarge the rule of evidence* as to the admission of such testimony."

In the same case this court cited approvingly from a case note in State v. Hefferman, 22 S. D. 513, 118 N. W. Rep. 1027, 25 L. R. A. (N. S.) 868, as follows: "This latter view is taken by an overwhelming majority of the courts, but *the real basis for the admission of such testimony seems to be the necessity from its admission to prevent the miscarriage of justice,* and the instances in which it is admitted *are in reality exceptions to* (sometimes recognized as such by the court), *rather than in compliance with the rule* that the accused is to be confronted with the witnesses against him."

Thus recognizing that testimony otherwise or theretofore inadmissible, should be admitted when it will prevent the miscarriage of justice. (The italics in the citations, *supra,* are mine.)

In the Blackwell case, *supra,* this court cited approvingly from Mattox v. United States, 156 U. S. 237, 15 Sup. Ct. Rep. 337, as follows: "But general rules of law of this kind, however beneficial in their operation and valuable to the accused, must occasionally give way to considerations of public policy and the necessities of the case."

The great Lord Ellenborough in the interest of truth and justice, allowed testimony to be introduced contrary to then existing rules of evidence, and as a warrant for his ruling, called attention to prior innovations when justice and truth so required, in this language: "The rules of evidence must expand according to the exigencies of society. I remember the innovation of receiving evidence of the handwriting of attesting witnesses abroad, to prove the execution of deeds. This entry, I think, is reasonable evidence to prove the contents of the letter of 18th December, 1807, which the defendants acknowledge they received, and which they do not produce upon a notice for

that purpose. We know that it is the habit of merchants to keep such a book; and a witness has sworn that the book in question was kept with great punctuality. Therefore, if the entry in Forbe's handwriting were not admitted, there would be no way in which the most careful merchant could prove the contents of a letter after the death of his entering clerk. It will therefore allow the entry to be read as *prima facie* evidence, and the defendants may rebut it by producing the original." Pritt and Others v. Fairclough and Others, 3 Camp. Nisi Prius Reports, 305.

The rules of evidence as they exist today are no more inflexible than they were when Lord Ellenborough held that they "must expand according to the exigencies of society."

If, as was said by the Supreme Court of the United States in the Forbes Pioneer Boat Line v. Commissioners of Everglades District, decided April 10, 1922, that "constitutional principles must leave some play to the joints of the machine," it seems most reasonable that rules of evidence "must leave some play to the joints of the machine."

How insignificant are the instances when courts have considered it advisable to change, modify, extend, enlarge and make exceptions to, rules of evidence as compared with the exigencies of the instant case! Here is no mere question of proving an account in a civil action—no mere punishment of a culprit—but a great and fundamental question, going to the very heart of constitutional government, and the constitutional enactment of laws, affecting the rights of property and personal liberty.

If the old rules of evidence established by the courts themselves to meet old conditions are inadequate to meet new conditions and remely new evils, then the rules of evidence should be changed or modified, or exception made to them, to meet the new conditions and prevent new evils.

So far, I have discussed this question upon the hypothesis that a well settled rule of evidence prevents this court from ascertaining the truth, and deciding the case in accordance therewith.    I am not satisfied, however, that there is any well established rule of evidence that prevents this court from receiving evidence to establish the time when an act took place, when the truth with regard to the date is escential to the validity of what purports to be a law.    The statute of frauds does not apply; there is no statutory rule of evidence that closes the door of this court to the truth; and there are no decisions of courts of last resort where this question has been decided adversely to the power of the courts to take evidence of the date of an event, when that date becomes essential to the enforcement of constitutional mandates.    It is conceded in the opinion of the majority of the court, that no case has been found that is exactly in point.    Says the opinion: "In the investigation of this question we have examined many decisions and text books and have had the aid of briefs of able counsel, but among all the decisions and text books we have not discovered a case nor a passage in any text book discussing the exact point presented here; the failure of the legislature to present a 'bill' duly passed to the Governor, where under a constitution like ours a bill duly passed does not become a law until presented to the Governor.    *    *  So far as we have discovered it is the first time in the history of this republic that officers of the legislature and the Governor have, as alleged in the bill of complaint, agreed among themselves to make an executive and legislative record of a transaction that never occurred.    We do not mean to say that the books do not record a similar transaction.    We have not found it.    So the case seems to be *sui generis* and the cases cited in the briefs therefore are not very helpful, because not analogous."

We are, therefore, confronted with a situation that so for as we can find has never arisen before.

What has been said by this and other courts about "reference to the legislative journals," is beside the question in this case and in no way applies; it being alleged that the challenged acts were done at a time when no legislative journal was kept.

The unconstitutionality of the act under consideration is based upon acts of legislative officers, which the sworn bill charges were done *after* the legislature adjourned *sine die.*

The legislative journals record only what transpires while the legislature is in session and *not after its adjournment,* and the lengthy discussion and array of authorities cited in the brief of the Attorney General to establish the proposition—that in order to ascertain if certain acts were done by certain officers *after* the legislature adjourned and when no journal was kept, we must *"look to the journal,"* and if we fail to find anything therein showing that these acts were done by those officers after the journal had ceased to be kept, we must assume that they were done during the legislative session—are of no avail.

As well look in a World Almanac of 1913 to ascertain when was was declared between Germany and Russia in 1914, as to look to a journal that ceased to be kept on June 3rd, to find out what happened outside the legislative halls on June 4th.

The law is settled in Florida, by numerous decisions of this court that a paper purporting to be an enrolled bill is not conclusive evidence of its own validity, or of its contents, but that it may be disproved by proper evidence.

It is true that heretofore this court has had recourse only to the journals to establish the invalidity of an act, but that is because the journals afford proof of the fact and not because of any special sanctity of the journal.

A new question, however, is presented in this case, where acts that determined the invalidity of the law, were done after the adjournment of the legislature, and of which the journals could not afford any proof.

In this new situation the court should advance another step in the interest of truth and the constitutional enactment of laws, and say that it will admit the testimony of the officers whose function and duty it was to sign the bill, to establish the date when it was signed, when such date becomes essential to the validity of the act.

The Attorney General in a very comprehensive brief contends that the cases cited by the appellee do not apply because of the different circumstances, conditions and facts, in those cases and the one at bar.

Accepting that as a proper rule in determining the effect of decisions of courts, no such direful consequences as pictured by the Attorney General would follow the decision in this case if we were to hold that where it is charged that the President and Secretary of the Senate and Speaker and Clerk of the House of Representatives did not sign a bill until after the adjournment of the legislature, and it became material to establish the truth of that allegation in order to determine the validity of the law, the court would receive the testimony of these officials, because this decision would be authority only where the facts and circumstances were the same.

I cannot agree with the conclusion reached by the majority of the court as to the effect of the signing of the

bill by the Governor. I do not regard his signature as certifying or purporting to certify anything except that he approved the bill on June 10, 1921.

The opinion says: "The Governor has no power to approve a document as a bill which has passed the legislature, unless it has been presented to him by that body with the signatures thereon of the presiding officers and clerks of the two houses, yet he approved this bill and transmitted it to the Secretary of State. It follows therefore that his signature attached to such bill in approval is equivalent to a certificate by him under oath that it reached his hand in due course;" meaning that the Governor by signing the bill did that which is "equivalent to a certificate by him under oath," that it reached his hand before the adjournment of the legislature with the signatures of the President of the Senate and the Speaker of the House attached thereto before such adjournment. This is placing upon the act of the Governor in signing the bill, a construction that it is extremely doubtful was contemplated by him, and which he no doubt would disclaim if given an opportunity.

This of itself would seem to be of sufficient gravity to warrant the admission of parol evidence, so that the Governor will not be put in the attitude of having done something that "is equivalent to a certificate by him under oath" of a condition of facts, which, under the allegations of the bill does not exist.

In discussing the power of this court to receive the testimony of officials as to the date when they performed certain official acts, the opinion in this case says: "For the judiciary to assume the power of exercising a supervisory ascendency over the official acts of the executive, is to

assert the superior, even supreme power of the judiciary over the other departments of government.''

This is the same argument that was used against the power of the courts to declare Acts of Congress unconstitutional, and which led Mr. Thomas Jefferson after the decision in Marbury v. Madison, to write to Mr. Adams, ''The opinion which gives to the judges the right to decide what laws are constitutional, and what not, not only for themselves in their own sphere of action, but for the Legislature and Executive also, in their spheres, would make the judiciary a despotic branch.'' Beveridge's Life of John Marshall, Vol. 3, p. 144.

President Jackson made the same contention in his message to Congress on July 10, 1832, vetoing the National Bank Act, where he said: ''The Congress, the Executive and the Court must each for itself be guided by its own opinion of the Constitution. Each public officer who takes an oath to support the Constitution swears that he will support it as he understands it, and not as it is understood by others. It is as much the duty of the House of Representatives, of the Senate, and of the President to decide upon the constitutionality of any bill or resolution which may be presented to them for passage or approval as it is of the supreme judges when it may be brought before them for judicial decision. The opinion of the judges has no more authority over Congress than the opinion of Congress has over the judges, and on that point the President is independent of both. the authority of the Supreme Court must not, therefore, be permitted to control the Congress or the Executive when acting in their legislative capacities, but to have only such influence as the force of their reasoning may deserve.'' Richardson's Messages and Papers of Presidents, Vol. 2, p. 582.

Notwithstanding these views, the law is settled otherwise, and the power of courts to declare void, acts of the legislature not enacted according to all the requirements of the Constitution, are seldom questioned, and the duty to do so should be unflinchingly performed.

The pre-eminent question involved in this case, as I see it, and which I have attempted to discuss, is, are rules of evidence more sacred than constitutional mandates? When therefore the situation is presented as in this case, where either the Constitution shall be violated, or rules of evidence modified or extended, I favor the extension of the rules of evidence to preserve the Constitution.

Having reached the conclusion that it is competent to prove by the testimony of the presiding officers of the Senate and the House of Representatives, the date when they signed the bill, it follows that for the purpose of deciding the legal question involved, the demurrer admits the allegations of the bill of complaint that House Bill No. 702 was not signed until June 4, 1921, the day after the legislature adjourned *sine die,* and that the order of the Circuit Judge overruling the demurrer should be affirmed.

TAYLOR, J., concurs.